OREGON SHORT LINE* & U. N. RY. Co. *v.* NORTHERN PAC. R. Co.

*(Circuit Court, D. Oregon.* June 15, 1892.)

1. CUSTOM AND USAGE—PROOF OF CUSTOM.

The testimony as to an alleged custom of railroad companies operating connecting lines, to receive from each other and transport freight in the cars in which it was tendered, established that, except where the cars of the receiving company were all in use, or where the freight would suffer by being transferred, the question whether the freight should be so received or should be transferred to the cars of the receiving company was, as a general rule, dependent upon contracts between the companies, or upon circumstances, such as the condition and equipment of the cars and the road over which they were to be transported, the determination resting with the receiving company, and the amount received in one way or the other constantly varying. *Held*, that no controlling custom was shown.

2. CARRIERS OF GOODS—CONNECTING LINES—PREPAYMENT OF FREIGHT.

In the absence of any regulation by law or custom, a railway company receiving freight from a connecting line is not required to advance or assume payment of the charges due thereon for transportation from the point of origin to the point of connection.

3. CARRIERS OF PASSENGERS—CONNECTING LINES—PASSENGER TICKETS.

In the absence of any arrangement between connecting railway companies, there is no obligation on the part of either to honor passenger tickets issued by the other.

4. CARRIERS — INTERSTATE COMMERCE ACT — DISCRIMINATION BETWEEN CONNECTING LINES.

Section 3 of the interstate commerce act, (24 St. p. 380,) making it unlawful for any common carrier, subject to the provisions of the act, to give "any undue or unreasonable preference" to any person, company, etc., or locality, or particular description of traffic, and providing that such carriers shall "afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for receiving, forwarding, and delivering passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines, but this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business," does not require a railroad company to receive freight in the cars in which it is tendered by a connecting line, and transport it in such cars, paying car mileage therefor, when it has cars of its own available, and the freight would not be injured by transfer. DEADY, J., dissenting.

5. SAME—RUNNING CONNECTIONS.

The provision in the charter of the Northern Pacific Railroad Company (Act Cong. July 2, 1864) requiring the company to permit other companies to form "running connections" with it, includes only such arrangements as to the arrival and departure of freight and passenger trains, and as to stations, platforms, and other facilities, as will enable companies desiring to make connections to do so without serious inconvenience, and does not impose any obligation upon the company to carry freight in the cars in which it may be tendered by a connecting line when its own cars are not in use, and the freight would not be injured by transfer to another car. DEADY, J., dissenting.

In Equity. Action by Oregon Short Line & Utah Northern Railway Company against the Northern Pacific Railroad Company. Judgment for defendant.

Statement by FIELD, Circuit Justice:

The complainant is a corporation formed under the act of congress of August 2, 1882, entitled "An act creating the Oregon Short Line Railway Company, a corporation in the territories of Utah, Idaho, and Wyoming, and for other purposes," (22 St. p. 185, c. 372,) and by the consolidation with it, under the authority of the general incorporation acts of those territories and of the state of Nevada, in force on the 27th of July, 1889, of the following corporations, namely: The Oregon Short

Line Railway Company, the Utah & Northern Railway Company, the Utah Central Railway Company, the Ogden & Syracuse Railway Company, the Nevada Pacific Railway Company, the Idaho Central Railway Company, and the Salt Lake & Western Railway Company. The defendant, the Northern Pacific Railroad Company, is a corporation created under the act of congress of July 2, 1864, entitled "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget sound, on the Pacific coast, by the northern route," (13 St. p. 365, c. 217,) and the various acts amending and supplementing the same. The complainant owns a line of railroad extending from Granger, in the former territory, now state, of Wyoming, to the boundary line between the states of Idaho and Oregon, and is the lessee of the lines of the Oregon Railway & Navigation Company, a corporation organized and existing under the laws of Oregon, extending from that boundary line to the city of Portland, Or. Its railroad connects with the Union Pacific Railway at Granger, and forms a part of the Union Pacific system. The lines of the Oregon Railway & Navigation Company and of the defendant are connected at Portland by the tracks of the Portland Terminal Company. The defendant owns a line of railroad extending northwardly from the tracks of the Terminal Company to Tacoma, Seattle, and other points on Puget sound, and thence eastwardly to Minneapolis, Minnesota Transfer, St. Paul, and other points. The lines of the two companies,—of the complainant and of the defendant,—connecting as stated at Portland, have been used as continuous lines for the carriage of a large amount of passenger and freight traffic. The complainant charges that the defendant has for some time past and still continues to unlawfully discriminate against it in the facilities afforded for receiving and forwarding freight and passengers tendered to it at that place. This suit is brought to enjoin the defendant from continuing in such alleged unlawful discrimination against the complainant. That discrimination consists in the difference of conditions under which the defendant will receive freight and passengers tendered to it at Portland by the complainant.

(1) The discrimination in receiving and forwarding freight is charged to be this: That it has at various times refused to transport freight tendered to it by the complainant, originating at points east of the ninety-seventh meridian, and destined to points on the lines of its railway north of Portland, when such freight was in cars other than those of its own, unless the complainant would assume to pay to the company owning such foreign cars the usual car mileage for their use, or transfer such freight from the foreign cars in which it was transported over its lines to cars owned by the defendant; and, in cases where the charges on such freight were not prepaid at the point of origin to destination, the defendant has refused to receive and transport such freight, unless the complainant would prepay the charges for transporting it from Portland to destination, and has refused to pay to the complainant, on receiving such freight, the charges due to it and connecting lines for transporting the same to Portland. The complainant alleges that such action on the

part of the defendant is contrary to the custom and practice in force among railways generally, and contrary to the custom and practice in force between the complainant and defendant as to all traffic originating on lines of the complainant and connecting lines west of the ninety-seventh meridian. It also alleges that during the time of such action the defendant has, except in a few instances, received and transported, and at the present time professes to be willing to receive and transport, to points on the lines of the defendant and lines connecting therewith north of Portland, freight originating west of the ninety-seventh meridian on the lines of the complainant, or other lines connecting therewith, when tendered to the defendant by the complainant at Portland, and has paid car mileage for the use of foreign cars in the transportation, and transported the freight in such foreign cars; and in cases where the charges on the freight were not prepaid to destination has not demanded or received from the complainant the charges for transporting the same from Portland to destination, and has paid to the complainant back charges due to it and connecting lines for transporting the freight from the point of origin to Portland. The complaint also alleges that during the same time the defendant has received and transported for the Southern Pacific Railroad Company freight originating both east and west of the ninety-seventh meridian without making against the company the discriminations complained of by the complainant.

(2) The discrimination in receiving and forwarding passengers is charged to be this: That the defendant has refused to transport passengers destined to Puget sound and other points on its lines, and on lines connecting therewith, when they have presented through tickets issued by the complainant, or by other railway companies operating over its lines via Portland, issued at points east of the 105th meridian. The complaint alleges that during the time of such refusal the defendant has received and transported passengers destined to like points presenting through tickets issued at points west of the 105th meridian by the complainant or by lines connecting therewith passing over its lines via Portland, and that the defendant at the same time has received and honored tickets of all kinds issued by the Southern Pacific Railway Company, connecting with it at Portland, or by railways connecting with it at St. Paul. The complainant charges that the refusal of the defendant to receive and transport freight in the cars in which it is tendered and to honor tickets as mentioned is an unreasonable and unjust discrimination against complainant and against its traffic originating east of the 97th and 105th meridians, and destined to points on Puget sound via Portland, and in favor of traffic originating east of the 97th and 105th meridians, and destined to points on Puget sound via Minnesota Transfer, at which latter point complainant alleges that defendant furnishes better facilities to connecting lines for the interchange of traffic than at Portland; and that the discrimination is in violation of the act of congress of February 4, 1887, entitled "An act to regulate commerce," commonly known as the "Interstate Commerce Act," (24 St. p. 379, c. 104,) and is in violation of section 5 of the defendant's charter, namely, of the act

of congress of July 2, 1864, (13 St. p. 365,) which requires it to permit any other railroad to form running connections with it on fair and equitable terms.

The answer of the defendant denies all the averments of the complaint, except the one that it has usually refused, and continues to refuse, to transport, in the cars in which it is tendered by complainant at Portland, freight originating at points east of the 97th meridian, destined to points on Puget sound, unless complainant waives on its own cars, and assumes to pay on the cars of other companies, the current rate of mileage for the number of miles they are run over its road. It denies that the defendant has refused to receive and transport freight tendered by complainant to it at Portland for transportation to points on Puget sound without prepayment of freight charges to points of destination, except certain classes of freight which it is the custom of railroads to carry only upon prepayment of charges; and that the terms and conditions desired by complainant for the interchange of traffic at Portland are fair and equitable; or that they are as fair and equitable as the terms and conditions upon which the defendant interchanges traffic with other companies at Portland and at other points. As a further defense, the defendant avers that the lines of the Oregon Railway & Navigation Company were, at all times mentioned in the bill of complaint, operated and controlled by the Union Pacific Railway Company as a part of its system; that the Union Pacific Railway Company and the Oregon Railway & Navigation Company, and the complainant and defendant, were at all times mentioned in the bill members of what is known as the "Transcontinental Association," and as members thereof they entered into an agreement and issued the necessary tariffs and instructions, under the terms of which the freight traffic originating east of the 97th meridian, and all passenger traffic originating east of the 105th meridian, destined to points on Puget sound, north of Portland, was to be routed via Minnesota Transfer and the Northern Pacific Railroad, and that in pursuance of that agreement the general freight agent of the Union Pacific system, including complainant's lines, issued the following circular:

"UNION PACIFIC RAILWAY COMPANY, GENERAL FREIGHT DEPARTMENT.

"Circular No. 685.                               OMAHA, January 16. 1889.

"*To Agents of the Connections:* Notice is hereby given that this company will not receive any freight for Puget sound points, or points of the Northern Pacific Railroad north of Portland, when originating at or east of the Missouri river. All such freights shall be routed by way of Minnesota Transfer.                               J. A. MONROE, General Freight Agent."

And that by this agreement Portland was made a common terminal point, with points on Puget sound north thereof, and the complainant had not, at the time of filing its bill of complaint, or at any other time, any arrangement or contract under which it was authorized to sell tickets to passengers from points east of the 105th meridian via Portland and defendant's line to Puget sound points. The defendant avers that, not-

withstanding these facts, the Union Pacific Railroad Company is soliciting business from points east of the 97th and 105th meridians for transportation to Puget sound points via complainant's and defendant's lines without authority from the defendant, and is representing that it can send freight and check baggage through without transfer, and has adopted the following system for sale of tickets from eastern points to · Puget sound points via complainant's and defendant's lines: It sells and delivers to passengers tickets coming from such eastern points to the city of Portland, and delivers to the passengers an order on the exchange ticket agent of the Oregon Railway & Navigation Company at Portland, for a ticket over the defendant's road from the city of Portland to the city of Tacoma, or other points on said road in the territory, now the state, of Washington, and the passenger, upon his arrival at the city of Portland, is furnished by the agent with either tickets or a sum of money sufficient to transport him to destination; and the price the passenger pays for such transportation, including that over defendant's line, is complainant's rate from the eastern points to the city of Portland. And the defendant avers that at the dates in the bill of complaint mentioned the complainant was, and is now, discriminating in the way stated, in favor of passengers traveling over its lines from eastern points to points north of the city of Portland.

Issue being joined upon the answer, evidence was taken, and upon the pleadings and proofs the cause was argued in the circuit court for the district of Oregon in June last. During the argument it was stipulated that the annual report of the Union Pacific Railroad Company should be deemed admitted in evidence. Counsel for the defendant then asked leave to amend its answer by averring the insolvency of the complainant and of the Union Pacific Railroad Company. Whereupon the court directed that the answer should be considered as though such amendment was made. After argument, counsel for the complainant requested 60 days' time to prepare briefs in the cause, which was given, with a similar time to the defendant to answer such briefs. By mutual arrangement between counsel, time for the preparation and furnishing of the briefs was extended so that they were not presented to the judges of the court until after the commencement of the October term of the supreme court of the United States at Washington, and during the session of that court the presiding justice of the circuit court was constantly occupied, and was unable to take up the cause and give it proper consideration. This is the reason for the long delay in disposing of the cause.

*W. W. Cotton* and *Zera Snow*, for complainant.
*Dolph, Bellinger, Mallory & Simon* and *Jas. M. Naught*, for defendant.

Mr. Justice FIELD, after stating the facts of the case, delivered the opinion of the court.

The oral arguments of counsel on the hearing of this case were extended and able, and their elaborate briefs since filed, covering 350 pages of printed matter in octavo form, touch upon nearly every question relating

to the receipt, transfer, and forwarding of freight and passengers by connecting lines of railway, and the respective rights and liabilities of the parties. To give proper consideration to the questions thus brought forward would extend this opinion into a treatise on the subject, which we have neither the disposition, time, nor necessary information to undertake and adequately perform. We shall therefore confine what we have to say to the consideration of the main proposition of the complainant, deeming that its determination will be sufficient for the disposition of the case before us. Its chief contention is that the defendant, as a common carrier by railway of freight and passengers, is obliged (1) to receive freight tendered to it by the complainant at Portland, Or., that being a point where it connects with the road of the complainant, in the cars in which it is tendered, and transport the same to point of destination in such cars, over its roads, and pay to the company owning the cars the current rate of mileage for their use, and also pay the charges for transportation from point of origin to Portland; (2) to honor tickets or coupons for passage over its lines north of Portland, issued by the complainant. This obligation of the defendant is asserted on three grounds: (1) The alleged established custom between railroad companies operating connecting lines; (2) the third section of the interstate commerce act; and (3) the fifth section of the defendant's charter, that is, of the act of congress of July 2, 1864, creating the Northern Pacific Railroad Company.

1. The complaint avers that it is the custom of railroad companies operating connecting lines to receive and transport freight tendered to them in the cars in which it is tendered, and to pay the usual car mileage on such cars, and to advance the charges for the transportation of the freight from point of origin to the point of connection. This averment is denied by the answer, and numerous witnesses were examined on the subject, called both by the complainant and the defendant, who had been or were connected with railroad companies as managers or superintendents, and who had had large experience in conducting traffic between connecting lines. Their testimony differs only in immaterial matters. It agrees in the main points, and is to this purport: That whether or not the freight received by one company shall be transported in the cars in which it is tendered, or be transferred to the cars of the receiving company, is, as a general rule, dependent upon contract between the connecting companies, and is not a matter in which there is any established custom applicable to all cases. Exceptions to the general rule arise when the cars of the receiving company are all in use; then the freight is usually received and transported in the cars in which it is tendered, that there may be no unnecessary delay in the transportation. Sometimes also the cars are received where the freight is of such a character that it may be injured by transfer from one car to another. There can be no usage founded in reason requiring the receiving company to transport the freight in the cars in which it is tendered, when its own cars are not in use. The receiving company is not under any obligation to allow its own cars to remain idle in order to transport

those of another company; in such cases, that is, where it has sufficient cars for the purpose not in use, it may properly refuse to receive the freight unless it is transferred to them.   The testimony establishes beyond controversy the positions thus stated, namely, that, except where the cars of the receiving company are all in use, or engaged for the time of the desired transportation, or where the freight is of such a character that it will suffer by being transferred to other cars, the receiving and transporting of the freight in the cars in which it is tendered is a matter of conventional arrangement between the connecting companies. In determining which of these modes shall be adopted many circumstances are to be taken into consideration, such as the condition of the cars, the wear to which they have been subjected, their ability to stand the speed of the company's trains, their equipment with air brakes, proper couplings, and the like, and also the condition of the road over which they are to be transported, and the arrangements made for side tracking the cars for the passage of meeting trains, in relation to which several matters no specific direction applicable to all cases can be given. The testimony shows that in some cases, where there is a large business at connecting points, nearly one half of the freight is transferred to the cars of the receiving company, and the remainder is taken in the cars in which the freight is tendered.   The amount received in one way or the other constantly varies.

The receiver of the Minneapolis & St. Louis Railway Company, and president of the Minnesota Transfer Company, testified that from his experience and observation the question of transferring cars received by one railway company from a connecting line, containing freight for transportation from a receiving line, was determined more or less by the nature of the freight, and the question whether the receiving line has or not plenty of cars of its own in which to load and forward the freight; that in some cases companies decline to allow their cars to go beyond the terminal point on their own line, and in such cases the freight is, of course, transferred.   One of the vice presidents of the Chicago, Milwaukee & St. Paul Railway Company testified that, when there is no agreement between the connecting companies on the subject, the question whether the freight tendered shall be transported to destination in the original cars, or be transferred into the cars of the receiving company, rests with the latter company.   The general manager of the Northern Pacific Railroad Company, in answer to the question, "What is the custom or method obtaining among railroads concerning the handling of cars?" testified as follows:

"The method of handling through business interchanged between railroads is controlled by various circumstances, in some cases by traffic contracts, which provide for cars going through without transfer or breaking bulk. In many cases it is controlled by conditions of what we might term the car market; that is, by the car supply.   There are times when railroads east of St. Paul give orders at the transfer to permit none of their cars to go beyond St. Paul.   There are times when they permit their cars to go through without breaking bulk.   On the other hand, there are times when the railroads north and west of St. Paul do not take through cars, even when the roads

tendering them are willing to have them go through, because they have sufficient of their own cars, and, under the general agreement and understanding between the railroads of the United States to pay a certain rate per mile on all cars of other railroad companies used over their lines, it would become a burden to take a foreign car, and permit its own car to lie idle, and pay a mileage rental for the foreign car. The receiving road determines for itself whether to take the cars of a connecting line or to transfer the freight to its own cars. This [said the witness] is the universal practice all over the country, [meaning, of course, in the absence of special contract on the subject.]"

It follows that the complainant has failed to show the existence of a controlling custom as to the manner of receiving and forwarding freight in the cars in which it is tendered. A controlling custom can only be established by long usage, and must be certain, reasonable, and uniform, to have the force of law.

As the receiving company is under no obligation to take the freight in the cars in which it is tendered, and transport it in such cars, when it has cars of its own, not in use, to transport it, there can be no custom that it shall pay the owner of such cars, should it receive them in such case, car mileage for their use. The car mileage in that case must be upon an arrangement between the parties. But when the receiving company takes the freight in the foreign cars because it has none of its own out of use to transport it, or because it would injure the freight to transfer it to its own cars, it is the general practice for the receiving company to pay the usual mileage on the cars taken and used, and such practice is a reasonable one, and should be enforced.

There is no law or custom requiring a railway company receiving freight from a connecting line to advance or assume the payment of the charges due thereon for the transportation from its point of origin to the connecting line. If it does thus advance or assume the payment of such charges, it can retain a lien upon the property transported for their payment as well as for the transportation rendered by itself. A railway company, like any other common carrier, has a right to demand that its charges for transporting goods shall be paid in advance, and is under no obligation to receive the goods for transportation unless such charges are paid, if demanded. The general practice, it is true, is to collect the charges upon delivery of the goods transported to the consignee, and, where goods are received without the payment in advance being demanded, it becomes the duty of the railway company to complete the carriage. Its right to payment in advance is thus waived. It holds, however, a lien upon the goods for payment, and in case the goods are delivered previous to payment it can hold the consignee responsible. The same law applies where the goods are received from the original consignor or from an intermediate carrier. The railway company, in the absence of any contract on the subject, is under no obligation to take the carriage in the one instance, or to continue the carriage in the other, without prepayment of its charges, if demanded.

As to the alleged obligation of the defendant to honor tickets or coupons for passage over its lines north of Portland, issued by the complain-

ant, it is sufficient to say there is no evidence in support of it.    The practice of railway companies, operating connecting lines, to honor tickets or coupons for passage over their respective lines issued by a connecting company, which is very general, is founded entirely upon arrangements between the connecting companies.    In the absence of such arrangements, there is no obligation on the part of either company to honor tickets issued by the other.    All the witnesses examined on this point concur in their statements in this respect.

2. But it is also contended that the obligation alleged of the defendant to receive freight tendered to it by the complainant at Portland, and to transport it to the point of destination without breaking bulk, in the manner mentioned, and to pay the charges stated, and honor the tickets of connecting companies for passage over its road north of Portland, is imposed by the third section of the interstate commerce act.    24 St. p. 380. c. 104.    That section is as follows:

"That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonaale preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.    Every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines, but this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business."

The first subdivision of this section does not make all preferences or advantages which may be given by a common carrier unlawful; only those which are undue or unreasonable are forbidden.    The second subdivision is similarly guarded in its provisions.    Common carriers are there only required, according to their respective powers, to afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and are forbidden to discriminate in their rates and charges between them.    And even this provision is subject to the limitation that it shall not be construed as requiring any common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business.    As justly said by the circuit court of the United States, in the case of *Kentucky & I. Bridge Co.* v. *Louisville & N. R. Co.*, 37 Fed. Rep. 624:

"No provision of the interstate commerce act confers equal facilities upon connecting lines under dissimilar circumstances and conditions.    On the contrary, even as to interstate commerce itself, the distinction is recognized throughout between discriminations and preferences which are just and reasonable and those which are unjust and unreasonable, according as they are made or given under similar or dissimilar circumstances and conditions.    All discriminations and preferences are not forbidden or made unlawful, but only

such as are unjust or undue or unreasonable are prohibited. In each and every case, therefore, the question whether a discrimination is unjust or a preference is undue or unreasonable, either as to the common carrier or the commerce it may transport, involves a consideration of the circumstances and conditions under which such discrimination or preference is made or given.".

It does not appear from the testimony produced in this case that the defendant has, as against the complainant, made or claimed the right to give any undue or unreasonable preferences or advantages to any person, company, firm, or corporation, or locality, in receiving and transporting freight in the cars in which it is tendered. It has claimed the right in all cases to refuse to take freight and transport it in foreign cars, when it has cars of its own in which it can be carried, except only where the freight is of such a character that its transfer to another car would be injurious to it. The answer of the defendant impliedly admits that it has usually refused to transport freight in foreign cars, where the freight has originated east of the 97th meridian, unless the complainant waived on its own cars, and assumed to pay on the cars of other companies, the current rates of mileage for the distance run over defendant's road; but such refusal can in no respect be deemed an unreasonable discrimination against the complainant, if made when the defendant's own cars were not in use, but were free to be employed in the transportation desired, or was made when to transfer the freight would not have been injurious to it. Nothing of this kind being shown, there was no foundation for the allegation of any unjust or illegal discrimination in favor of other companies, as against the complainant, upon which this suit proceeds.

The alleged discrimination against freight originating east of the 97th and 105th meridians, in favor of freight originating west of those meridians, is not shown to have been made under conditions which rendered it unreasonable or a denial of equal facilities afforded to others. Proof to that effect must be produced to authorize a court to interfere with the conduct of a railroad company in the interchange of traffic with connecting lines, upon charges of giving undue or unreasonable preferences to some of them over others, and thus unlawfully discriminating between them. The provision in the second subdivision of the third section of the interstate commerce act, that a common carrier shall not be required to give the use of its tracks and terminal facilities to another carrier engaged in like business, is a limitation upon or qualification of the duty declared of affording all reasonable, proper, and equal facilities for the interchange of traffic, and the receiving, forwarding, and delivering of passengers and property to and from the several lines and those connecting therewith. It was so expressly held in the case above cited of *Kentucky & I. Bridge Co.* v. *Louisville & N. R. Co.*, 37 Fed. Rep. 571.

It follows from this, as it was decided in that case, that a common carrier is left free to enter into arrangements for the use of its tracks or terminal facilities with one or more connecting lines, without subjecting itself to the charge of giving undue or unreasonable preferences or ad-

vantages to such lines, or of unlawfully discriminating against other carriers. In making arrangements for such use by other companies, a common carrier will be governed by considerations of what is best for its own interests. The act does not purport to divest the railway carrier of its exclusive right to control its own affairs, except in the specific particulars indicated. As said in the case of *Chicago & A. Ry. Co.* v. *Pennsylvania Ry. Co.*, 1 Int. St. Com. R. 86, 95:

"The right of ownership of railroad property, with the power of control over employes and management of the property, is as absolute under the act as before its passage. The regulation of commerce between the states, which is all that the act contemplates, does not involve community of property or joint control of subordinates among the several companies that honor through tickets. The corporate powers of every company for all administrative and governing purposes within its prescribed sphere remain unimpaired. With the legitimate exercise of these powers another company has no concern and no right to intermeddle."

3. The fifth section of the defendant's charter, that is, of the act of congress of July 2, 1864, creating the Northern Pacific Railroad Company, making it the duty of that company to permit any other railroad company which should be authorized to be built by the United States, or by the legislature of any territory or state in which the same may be situated, to form running connections with it on fair and equitable terms, does not impose any obligation upon the company to carry freight in the cars in which it may be tendered by a connecting line when its own cars are not in use, except where the transfer of the freight to another would be injurious to it. In all other cases the receipt and transport of the freight tendered in foreign cars is a matter of conventional arrangement between it and the connecting company. The running connections which must be permitted by the defendant are not, as contended by complainant's counsel, a running over its line, but only in connection with it; a provision intended to secure the transportation and exchange of freight between connecting lines, and not the use of each other's road by the cars of such companies. Whenever an intention has been manifested, in the creation of railway charters, that a connecting company shall have the power to run its cars over the lines of another, or to require one company to haul over its line the cars of another, such intention has been expressed in unequivocal terms, such as is found in the constitutions or statutes of several of the states respecting railway companies, which is substantially in these terms: "And they shall receive and transport each other's passengers, tonnage, and cars, loaded or empty, without delay or discrimination." In some of the English charters of railway companies it is provided that all companies and persons shall be entitled to use the railway with engines and carriages, properly constructed, subject to the provisions of the "act for the better regulation of railways and for the conveyance of troops, and regulations to be from time to time made by the company."

The terms "running connections," as used in the act of July 2, 1864, in incorporating the defendant, apply to both passenger and freight con-

nections and facilities, and yet they do not require the defendant to haul special cars of other companies, such as excursion cars, sleeping cars, or cars designed for accommodation in certain particulars, in the absence of specific contract to that effect. *Worcester Excursion Car Co.* v. *Pennsylvania R. Co.*, 3 Int. St. Com. R. 581. Section 5 of its charter requires it to furnish the equipment to be used on its road. As justly observed by counsel, a running connection which should require the defendant to receive in its freight and passenger trains, composed of cars equipped with automatic couplers, air brakes, steel tires, and other improvements tending to facilitate the safe and economical operation of the train and lessen the probability of accidents, cars without such equipment, and not adapted to the service and facilities furnished by the defendant, cannot be regarded as fair and equitable. We are of opinion that a running connection of one road with another, within the meaning of the defendant's charter, only includes such arrangements as to the time of arrival and departure of trains, and as to stations, platforms, and other facilities, as will enable companies desiring to connect to do so without detriment or serious inconvenience.

We do not deem it essential to inquire into the arrangements alleged to have been made by the Transcontinental Association, and how far those arrangements should be regarded as binding upon the parties as to traffic in freight originating east of the 97th meridian, and in the passenger traffic originating east of the 105th meridian, as the material questions which must govern the interchange of freight and passengers at points of connection in their respective lines, from whatever quarter they may come, are considered so far as there is any difference in the contention between the parties to this suit.

Upon a consideration of whatever we deem material in the controversy before us, and the proofs which have been produced as to the course of business pursued by the defendant, we do not perceive anything against which the complainant can make any valid objection. It is not shown that the defendant has, at any time, refused to make proper connections with the complainant seeking to send freight or passengers over its lines north of Portland, or has, in that respect, given any undue or unreasonable preferences or advantages to other companies over the complainant. It was under no obligation, by custom or law, to receive the freight of the complainant or of other companies in the cars in which it was tendered, and transport it over its own road in such cars, when its own cars were not in use, but were free to be employed in the transportation desired, unless it would be injurious to the freight to have it removed from one car to another. Nor is it shown that in any cases it has unlawfully discriminated in its charges against the complainant in the transportation of its freight in favor of other companies. It therefore follows, without further consideration of the numerous matters touched upon by counsel, that the bill cannot be sustained. It will therefore be dismissed, and the mandatory injunction heretofore issued be dissolved; and it is so ordered.

DEADY, District Judge, (*dissenting.*)   I am sorry I am not able to concur in the foregoing opinion, and, although I do it with some hesitation, I think it proper to give briefly my reasons therefor.   It is admitted by counsel for the defendant that the second clause of section 3 of the act entitled "An act to regulate commerce," (24 St. 380,) is new, and imposes obligations and restraints upon common carriers, "subject to the provisions of the act," unknown to the common law; and this is apparent independent of such admission.   The question is, what are these obligations and restraints?   The plaintiff contends in this case that the duty imposed upon the defendant is at least that of hauling car loads of freight, without breaking bulk, when tendered it by the plaintiff, over its line, from Portland to points on the Sound, charging therefor its local rates, and paying therefor, for the use of the car, the customary rate of one fourth of a cent per mile.   The defendant denies this obligation, and contends it is only bound to carry freight in its own cars, and that the plaintiff must unload its cars at Portland, and tender the freight thus unloaded, to be reloaded on the defendant's cars as if it originated at that point.   This much it was bound to do at common law,—to carry all freight tendered to it in the order in which it was received.   But the section goes beyond the common law, and therefore it must impose a duty beyond that of merely receiving freight from the plaintiff when unloaded from its cars.   The language of the second clause of the section in this respect is as follows:

"Every common carrier, subject to the provisions of this act, shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines, and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines; but this shall not be construed as requiring any such common carrier to give the use of its track or terminal facilities to another carrier engaged in like business."

The carrier is to afford these "facilities" for what purpose?   The act says, "For the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith."   To exchange freight in bulk, by car loads, is certainly a "reasonable and proper facility" for that purpose.   It is a general custom, except in some special instance like this, where the carrier disobeys the injunction of the law for the purpose of injuring a competing line in its own interest.   To exchange freight by the car load is a "reasonable and proper facility" for the interchange of traffic between these lines, and it is such a facility to enable them to receive and forward passengers and property to and from their respective lines and those connected with them.   On the other hand, to require the plaintiff to unload its cars with freight destined for points on the sound, at Portland, and there reload the same on the defendant's cars as freight originating at the latter point, is to afford no facilities for such purpose at all.   Such a construction of the statute renders it altogether nugatory, and leaves

the matter as at common law. The proviso to the section strongly supports the plaintiff's contention. It was evidently inserted out of abundance of caution, lest the very general and unqualified language of the preceding clause might be "construed" to authorize or require one "carrier" to give the use of its tracks or terminal facilities to another. But, short of this, all facilities known to the railway business, whether the result of contract or custom, must be regarded as "reasonable and proper," in the interchange of traffic, or the receiving, forwarding, and delivering of passengers and property to and from connecting lines, such as those of the plaintiff and the defendant.

The cost of unloading freight from the plaintiff's cars to the defendant's, at this point, operates as a hindrance, if not a bar, to the transport of freight by the former, originating east of the 97th meridian, to be delivered at points on the Sound. The defendant has no more natural right to a monoply of this business than it has to that originating west of said meridian. To compel the plaintiff to submit to this exaction is to require it to build a competing road between Portland and the sound, when one is amply able to do all the business. The community is thereby taxed to support two roads, where one only is necessary. The defendant should be required to haul the plaintiff's cars, and also pay the back charges on the freight to this point, and collect the same from the consignee on the Sound. This is a "reasonable and proper facility" for the transaction of business, and is customary and usual as well. There may be exceptions to this rule, as in the case of perishable freight. But in all other cases the defendant takes no risk in paying such charges, because the freight is good for them. "All reasonable and proper facilities for the interchange of traffic," and "for the receiving, forwarding, and delivering of passengers and property," to and from connecting lines, includes, at least, such facilities as railways were accustomed to afford one another before the passage of the act, whether as the result of usage or contract. Nothing less could have been in the mind of the legislature on the passage of the act. And in my judgment the last clause of section 5 of the act organizing the Northern Pacific Railway Company (13 St. p. 369) also requires the defendant to afford the plaintiff the facilities in question. It reads:

"And it shall be the duty of the Northern Pacific Railway Company to permit any other railroad which shall be authorized to be built by the United States, or by the legislature of any territory or state in which the same may be situated, to form running connections with it, on fair and equitable terms."

This statute is mandatory. The matter is not left to the pleasure or judgment of the defendant. It shall be its "duty" to permit any other road to form "running connections with it on fair and equitable terms." What are "running connections" but the right to have car loads of freight hauled over the defendant's road, and that "on fair and equitable terms," which means, at least, such terms as are usual in such cases, whether established by custom or contract. Nothing more is asked by the plaintiff in this case, and, in my judgment, the injunction should be made perpetual.