LITTLE ROCK & M. R. CO. v. ST. LOUIS S. W. RY. CO. (two cases. Nos. 394, 399). SAME v. ST. LOUIS, I. M. & S. RY. CO. (two cases. Nos. 395, 398). SAME v. LITTLE ROCK & FT. S. RY. CO. (two cases. Nos. 396, 397).

(Circuit Court of Appeals, Eighth Circuit. September 24, 1894.)

1. CARRIERS—INTERSTATE ACT—CONNECTING LINES—DISCRIMINATION—PREPAYMENT OF CHARGES.

An interstate carrier does not subject another carrier to an "undue or unreasonable disadvantage" (Interstate Commerce Act, § 3, cl. 2) by exacting the prepayment of freight on all property received from it at a given station, although it does not require charges to be paid in advance on freight received from other individuals and competing carriers at such station. 59 Fed. 400, affirmed.

2. SAME—THROUGH BILLING, RATING, AND LOADING.

An interstate carrier which enters into an arrangement with a connecting carrier for through billing, rating, and loading, and for the use of its tracks and terminals, is not obliged to make the same arrangement with other connecting carriers, though the physical facilities for an interchange of traffic are the same. 59 Fed. 400, affirmed.

Appeals from and Writs of Error to the Circuit Court of the United States for the Eastern District of Arkansas.

These were six suits which were brought by the Little Rock & Memphis Railroad Company against the St. Louis Southwestern Railway Company, the St. Louis, Iron Mountain & Southern Railway Company, and the Little Rock & Ft. Smith Railway Company, for alleged violations of the third section of the interstate commerce law (24 Stat. 379, 380). A suit at law and a bill in equity were filed against each of the defendant companies above named, in which the Little Rock & Memphis Railroad Company counted upon the same violation of the law; asking in the one case for an injunction, and in the other for damages. The six suits against the three companies involved similar questions. They have been argued as one case, and it is found most convenient to dispose of them in a single opinion. Subjoined diagrams will serve to illustrate the relations which the several railroads concerned occupy to each other. It will be seen by a glance at diagram No. 1 that the Little Rock & Memphis Railroad runs east and west from Little Rock, Ark., to Memphis, Tenn. Its total length is about 135 miles. Coming down from the north, the St. Louis Southwestern Railway crosses the Little Rock & Memphis Railroad at Brinkley, a point intermediate between Little Rock and Memphis. It also crosses a branch of the St. Louis, Iron Mountain & Southern Railway, leading from the main line of that road into Memphis, at Fair Oaks, which is a point about 20 miles north of Brinkley. Diagram No. 2 illustrates the situation further west, in and about Little Rock. It will be seen that the main line of the St. Louis, Iron Mountain & Southern Railway Company enters Little Rock from the north, and thence runs southwest through Arkansas into Texas, with a branch leading from Little Rock to the southeast. The Little Rock & Ft. Smith Railway runs west from Little Rock to Ft. Smith on the western border of the state of Arkansas, and to Ft. Gibson in the Indian Territory. Its length is said to be about 165 miles. Diagram No. 2 does not show the main line of the St. Louis Southwestern Railway, which is disclosed by the first diagram; but it is sufficient to say that, after passing through Brinkley, it runs in a southwesterly direction through Arkansas, and far into Texas. As against the St. Louis Southwestern Railway Company, complaint was made that it refused to receive freight or passengers coming over the Little Rock & Memphis Railroad except at local rates, and that it refused to honor through tickets or through bills of lading issued by the latter road, and that it required all freight to be rebilled and reloaded, and all passengers to purchase new tick-

ets, at the town of Brinkley, while at the same time it accepted through tickets and through bills of lading, and cars loaded in car-load lots, that came over the line of the St. Louis, Iron Mountain & Southern Railway Company, and that it did this although the facilities for an interchange of freight and passengers at Brinkley were in every respect equal to those existing at Fair Oaks. As against the Little Rock & Ft. Smith Railway Company, complaint was made that it refused to accept interstate freight at Little Rock under through bills of lading issued by the Little Rock & Memphis Railroad Company, while it accepted freight under through bills of lading issued by all other lines of railroad terminating at the city of Little Rock, Ark., and that it likewise refused to accept freight from the Little Rock & Memphis Railroad Company except upon prepayment of all freight charges, while at the same time it accepted freight at Little Rock from all other individuals and corporations without the prepayment of freight charges. Complaint was also made against the Little Rock & Ft. Smith Railway Company that it accepted from the St. Louis, Iron Mountain & Southern Railway Company passengers on through tickets, and with through checking of baggage, while it refused to accept passengers coming over the Little Rock & Memphis Railroad on through tickets issued by that road, and that it charged passengers coming from that road local rates from Little Rock westward, and required them to recheck their baggage at Little Rock. Complaint was also made against the Little Rock & Ft. Smith Railway Company that it exchanged freight with the St. Louis, Iron Mountain & Southern Railway upon an arrangement for through billing, and in the cars in which it was shipped, when shipped in car-load lots, and that it refused at the same time to exchange freight with the Little Rock & Memphis Railroad Company, except upon local rates, and that it refused to accept from or deliver to the latter road any loaded cars. As against the St. Louis, Iron Mountain & Southern Railway Company, complaint was made that it refused to receive any freight from the Little Rock & Memphis Railroad Company at Little Rock, except upon the prepayment of all charges thereon, while it received freight at that point from all other persons and corporations without demanding the prepayment of freight charges. It was further alleged, as against that company, that the discrimination in question was made, not because the defendant company was unwilling to extend credit to the Little Rock & Memphis Railroad Company, but from a desire to oppress that company and destroy its business. A demurrer having been filed to the several bills in equity and complaints at law, the same were sustained by the circuit court, whereupon the complainant company declined to plead further, and a final judgment dismissing the action was entered in each case. The opinion of the circuit court is reported in 59 Fed. 400.

The following is the plat referred to in the statement:

DIAGRAM NO. 1.                    DIAGRAM NO. 2.

W. E. Hemingway (U. M. Rose and G. B. Rose, on the brief), for appellant and plaintiff in error.

George E. Dodge (B. S. Johnson, on the brief), for appellees and defendants in error Little Rock & Ft. S. Ry. Co. and St. Louis, I. M. & S. Ry. Co.

John M. Taylor (Samuel H. West and J. G. Taylor, on the brief), for appellee and defendant in error St. Louis S. W. Ry. Co.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

It will be observed that the sole question in the cases filed against the St. Louis, Iron Mountain & Southern Railway Company concerns the right of that company to require the prepayment of freight charges on all property tendered to it for transportation at Little Rock by the Little Rock & Memphis Railroad Company, while it pursues a different practice with respect to freight received from other shippers at that station. At common law a railroad corporation has an undoubted right to require the prepayment of freight charges by all its customers, or some of them, as it may think best. It has the same right as any other individual or corporation to exact payment for a service before it is rendered, or to extend credit. Oregon Short Line & U. N. Ry. Co. v. Northern Pac. R. Co., 51 Fed. 465, 472. Usually, no doubt, railroad companies find it to their interest, and most convenient, to collect charges from the consignee; but we cannot doubt their right to demand a reasonable compensation in advance for a proposed service, if they see fit to demand it. This common-law right of requiring payment in advance of some customers, and of extending credit to others, has not been taken away by the interstate commerce law, unless it is taken away indirectly by the inhibition contained in the third section of the act, which declares that an interstate carrier shall not "subject any particular person, company, corporation or locality * * * to any undue or unreasonable * * * disadvantage in any respect whatever." This prohibition is very broad, it is true, but it is materially qualified and restricted by the words "undue or unreasonable." One person or corporation may be lawfully subjected to some disadvantage in comparison with others, provided it is not an undue or unreasonable disadvantage. In view of the fact that all persons and corporations are entitled at common law to determine for themselves, and on considerations that are satisfactory to themselves, for whom they will render services on credit, we are not prepared to hold that an interstate carrier subjects another carrier to an unreasonable or undue disadvantage because it exacts of that carrier the prepayment of freight on all property received from it at a given station, while it does not require charges to be paid in advance on freight received from other individuals and corporations at such station. So far as we are aware, no complaint had been made of abuses of this character at the time the interstate commerce law was enacted, and it may be inferred that the

particular wrong complained of was not within the special contemplation of congress. This being so, the general words of the statute ought not to be given a scope which will deprive the defendant company of an undoubted common-law right, which all other individuals and corporations are still privileged to exercise, and ordinarily do exercise. It is most probable that self-interest—the natural desire of all carriers to secure as much patronage as possible—will prevent this species of discrimination from becoming a public grievance so far as individual shippers are concerned; and it is desirable that the courts should interfere as little as possible with those business rivalries existing between railroad corporations themselves, which are not productive of any serious inconvenience to shippers. We think, therefore, that no error was committed in entering the judgment and decree in favor of the St. Louis, Iron Mountain & Southern Railway Company.

The complaint preferred against the other companies, to wit, the St. Louis Southwestern and the Little Rock & Ft. Smith Railway Companies, is somewhat different. It consists in the alleged refusal of those companies—First, to honor through tickets and through bills of lading issued by the complainant company, or to enter into arrangements with it for through billing or through rating; and, secondly, in the alleged refusal of these companies to accept loaded cars coming from the Little Rock & Memphis Railroad, and in their action in requiring freight to be rebilled and reloaded at the two connecting points, to wit, Brinkley and Little Rock.

Before discussing the precise issue which arises upon this record, it will be well to restate one or two propositions that are supported by high authority as well as persuasive reasons, and which do not seem to be seriously controverted even by the complainant's counsel. In the first place, the interstate commerce law does not require an interstate carrier to treat all other connecting carriers in precisely the same manner, without reference to its own interests. Some play is given by the act to self-interest. The inhibitions of the third section of the law, against giving preferences or advantages, are aimed at those which are "undue or unreasonable;" and even that clause which requires carriers "to afford all reasonable, proper and equal facilities for the interchange of traffic" does not require that such "equal facilities" shall be afforded under dissimilar circumstances and conditions. Moreover, the direction "to afford equal facilities for an interchange of traffic" is controlled and limited by the proviso that this clause "shall not be construed as requiring a carrier to give the use of its tracks or terminal facilities to another carrier." Kentucky & I. Bridge Co. v. Louisville & N. R. Co., 37 Fed. 571; Oregon Short Line & U. N. Ry. Co. v. Northern Pac. R. Co., 51 Fed. 465, 473. In the second place, it has been held that neither by the common law nor by the interstate commerce law have the national courts been vested with jurisdiction to compel interstate carriers to enter into arrangements or agreements with each other for the through billing of freight, and for joint through rates. Agreements of this nature, it is said, under existing laws, depend upon the voluntary action of the parties, and cannot be enforced by judicial proceed-

ings without additional legislation. Little Rock & M. R. Co. v. East Tennessee, V. & G. R. Co., 3 Interst. Commerce Com. R. 1, 16, 17; Little Rock & M. R. Co. v. St. Louis, I. M. & S. Ry. Co., 41 Fed. 559, and cases there cited by Judge Caldwell. Furthermore, it has been ruled by Mr. Justice Field in the case of the Oregon Short Line & U. N. Ry. Co. v. Northern Pac. R. Co., 51 Fed. 465, 474, that the third section of the interstate commerce act does not require an interstate carrier to receive freight in the cars in which it is tendered by a connecting carrier, and to transport it in such cars, paying a mileage rate thereon, when it has cars of its own that are available for the service, and the freight will not be injured by transfer. It should be remarked in this connection that the bills on file in the present cases, as well as the petitions in the law cases, fail to disclose whether the offending companies have refused to receive freight in the cars in which it was tendered to them, even when it would injure the freight to transfer it, or when they had no cars of their own that were immediately available to forward it to its destination. Neither do the bills or the petitions disclose whether, in tendering freight in cars to be forwarded, the complainant company demanded the payment of the usual wheelage on the cars, or tendered the use of the same free, for the purpose of forwarding the freight to its destination. The allegations of a refusal to receive freight in cars are exceedingly general, and convey no information on either of the points last mentioned.

As we have before remarked, the several propositions above stated do not seem to be seriously questioned. It is urged, however, in substance, that although the court may be powerless to make and enforce agreements between carriers for through billing and through rating, and for the use of each other's cars, tracks, and terminal facilities, yet that when a carrier, of its own volition, enters into an agreement of that nature with another connecting carrier, the law commands it to extend "equal facilities" to all other connecting carriers, if the physical connection is made at or about the same place, and the physical facilities for an interchange of traffic are the same, and that this latter duty the courts may and should enforce. It will be observed that the proposition contended for, if sound, will enable the courts to do indirectly what it is conceded they cannot do directly. It authorizes them to put in force between two carriers an arrangement for an interchange of traffic that may be of great financial importance to both, which could neither be established nor enforced by judicial decree, except for the fact that one of the parties had previously seen fit to make a similar arrangement with some other connecting carrier. It may be, also, that the arrangement thus forced upon the carrier would be one in which the public at large have no particular concern, because the equal facilities demanded by the complainant carrier would be of no material advantage to the general public, and would only be a benefit to the complainant.

Another necessary result of the doctrine contended for is that it deprives railway carriers, in a great measure, of the management and control of their own property, by destroying their right to de-

termine for themselves what contracts and traffic arrangements with connecting carriers are desirable and what are undesirable. There ought to be a clear authority found in the statute for depriving a carrier of this important right, before the authority is exercised, for, when questions of that nature have to be solved, a great variety of complex considerations will present themselves, some of which can neither be foreseen nor stated. A railroad having equal facilities at a given point for forming a physical connection with a number of connecting carriers might find it exceedingly beneficial to enter into an arrangement with one of them, having a long line and important connections, for through billing and rating, and for the use of each other's cars and terminal facilities, while it would find it exceedingly undesirable and unprofitable to enter into a similar arrangement with a shorter road, which could offer nothing in return. Or the case might be exactly the reverse. The shorter, and at the time the less important, road, might be able to present sound business reasons which would make an arrangement with it, of the kind above indicated, more desirable than with the longer line. Furthermore, if it be the law that an arrangement for through billing and rating with one carrier necessitates a like arrangement with others, this might be a controlling influence in determining a railway company to refuse to enter into such an arrangement with any connecting carrier. In view of these considerations, we are unable to adopt a construction of the interstate commerce act which will practically compel a carrier, when it enters into an arrangement with one carrier for through billing and rating and for the use of its tracks and terminals, to make the same arrangement with all other connecting carriers, if the physical facilities for an interchange of traffic are the same, and to do this without reference to the question whether the enforced arrangement is or is not of any material advantage to the public.

In two of the cases heretofore cited (Kentucky & I. Bridge Co. v. Louisville & N. R. Co., and Oregon Short Line & U. N. Ry. Co. v. Northern Pac. R. Co.), it was held that the charge of undue or unreasonable discrimination cannot be predicated on the fact that a railroad company allows one connecting carrier to make a certain use of its tracks or terminals, which it does not concede to another. This conclusion was reached as the necessary result of the final clause of the third section of the interstate commerce law, above quoted, to the effect that the second paragraph of the third section shall not be so construed as to require a carrier to give the use of its tracks or terminals to another company. Railroads are thus left by the commerce act to exercise practically as full control over their tracks and terminals with reference to other carriers as they exercised at common law. The language of Mr. Justice Field in that behalf was as follows:

"It follows from this * * * that a common carrier is left free to enter into arrangements for the use of its tracks or terminal facilities, with one or more connecting lines, without subjecting itself to the charge of giving undue or unreasonable preferences or advantages to such lines, or of unlawfully discriminating against other carriers. In making arrangements for

such use by other companies, a common carrier will be governed by considerations of what is best for its own interests. The act does not purport to divest the railway carrier of its exclusive right to control its own affairs, except in the specific particulars indicated." 51 Fed. 474, 475.

Furthermore, it is the settled construction of the act, as we have before remarked, that it does not make it obligatory upon connecting carriers to enter into traffic arrangements for through billing and rating either as to passenger or freight traffic. This conclusion has been reached by all of the tribunals who have had occasion to consider the subject, and it is based on the fact that, in enacting the commerce act, congress did not see fit to adopt that provision of the English railway and canal traffic act, passed in 1873, which expressly empowered the English commissioners to compel connecting carriers to put in force arrangements for through billing and through rating when they deemed it to the interest of the public that such arrangements should be made. Little Rock & M. R. Co. v. East Tennessee, V. & G. R. Co., 3 Interst. Commerce Com. R. 1, 9, 10; Kentucky & I. Bridge Co. v. Louisville & N. R. Co., 37 Fed. 567, 630, 631. See, also, the second annual report of the interstate commerce commission (2 Interst. Commerce Com. R. 510, 511). In the light of these adjudications, we are compelled to conclude that if the charge of an unreasonable discrimination cannot be successfully predicated on the ground that a railway company makes an arrangement with one connecting carrier for the use of its tracks and terminals, which it refuses to make with another, although the physical facilities for an interchange of traffic are the same, then the charge of discrimination cannot be predicated on the ground that it makes an arrangement for through billing and rating with one carrier, and does not make it with another. The interstate commerce act does not, it seems, at present, make it obligatory on carriers to make arrangements of either sort, and does not give the commission power to compel such arrangements, but leaves connecting carriers, as at common law, to determine for themselves when such arrangements are desirable, and when undesirable. Moreover, arrangements for through billing and rating will, as a general rule, necessarily involve an agreement for the use, to some extent, of each other's terminals and tracks; and, by the express language of the statute, such use cannot be enforced without the consent of the owner. We are unwilling, therefore, as the law now stands, to compel the defendant companies to afford the facilities which the complainant demands. As was said by Mr. Justice Jackson, then circuit judge, in the case to which we have already referred:

"The law should be as liberally construed in favor of commerce among the states as its language will permit; but, when complaint is made or relief is sought solely or mainly in the interest of the common carriers engaged in the transportation of such commerce, the act complained of or the right asserted should not rest upon any doubtful construction, but should clearly appear to have been forbidden or conferred."

We are also forced to conclude that if the public interest requires that interstate carriers shall be compelled to put in force arrangements for through billing and rating, and for the establish-

ment of joint through lines, the statute should be made more explicit, and that the commission should be empowered to prescribe the terms of such arrangements upon a comprehensive view of the circumstances of each particular case.

Some allusion was made in the argument to a provision found in the constitution of the state of Arkansas (article 17, § 1), as having some bearing on the questions discussed in these cases; but as the bills and petitions filed are plainly founded on the interstate commerce law, and thus involve a federal question arising under that act, and as there is no jurisdiction arising from diverse citizenship, we have not felt called upon to consider or decide the proposition founded upon the constitution of the state. In view of what has been said, the several decrees and judgments are hereby affirmed.