BROWN & BROWN COAL CO. *v.* GRAND TRUNK RAILWAY
SYSTEM.

CARRIERS—DISCRIMINATION—MANDAMUS—RAILROADS.

The refusal of a railway company to extend credit for freight
charges to a shipper with whom it had had previous difficulty
does not constitute an unreasonable disadvantage or preju-
dice under Act No. 312, Pub. Acts 1907, and does not entitle
the shipper to the writ of mandamus.

Certiorari to Wayne; Donovan, J. Submitted Novem-
ber 16, 1909. (Calendar No. 23,211.) Decided February
3, 1910.

Mandamus by the Brown & Brown Coal Company to
compel the Grand Trunk Railway System to forward cer-
tain freight without the prepayment of charges. An or-
der denying the writ is reviewed by relator on writ of
certiorari. Affirmed.

*E. T. Berger*, for relator.

*L. C. Stanley*, for respondent.

BLAIR, J. On or about October 22, 1908, the defend-
ant railroad company delivered to the siding of the relator
eight cars of sand, upon all of which cars certain freight
charges were due and payable at the time of delivery.
On the same day as delivery, the relator directed the rail-
road company to deliver three of said cars to the Fairview
Coal & Supply Company of Detroit, with freight charges
to follow, and deliver five of said cars to the People's Ice
Company of Detroit, with charges to follow. In direct-
ing charges to follow it was understood that same were
collectible from the parties to whom the cars were directed
to be forwarded. It is admitted by the railroad company
that cars were so delivered and orders were received for

forwarding as above stated. The defendant railroad company refused to forward the cars until the charges thereon had been paid by the relator, and refused to undertake to move the cars to, and collect the charges thereon from, the parties to whom they were directed to be forwarded. On October 28, 1908, a car loaded with gravel was delivered to the relator's siding, and on the same day it directed the railroad company to deliver same to Schillinger Brothers of Detroit, with freight charges to follow. The railroad company refused to move the car until the charges were paid by the relator. The relator claims in this case that it had, until the month of August, 1908, been doing business with the railroad company under its usual custom of forwarding cars to its purchasers with all charges to follow, and that this custom had been in full force and effect ever since it was in the sand and gravel business, and that because of a dispute with the railroad company over car measurements in another and different matter the railroad company, as a retaliatory measure, refused to move the cars in question in this case until the relator had advanced freight charges thereon. The relator further claims that other dealers in sand and gravel in the city of Detroit doing business with the defendant railroad company are accorded the privilege of forwarding materials in car lots to their customers with freight charges to follow and paid by the parties to whom they were to be forwarded. The relator claims that this is the way they do business, and the terms upon which the materials are sold include the payment by the purchaser of the freight charges, and that by reason of the arbitrary action of the defendant railroad company in suddenly refusing to continue its custom the relator company was put to a serious disadvantage with its competitors.

Jacob G. Brown, relator's assistant manager, testified:

"The Grand Trunk System maintains what is known as a 'credit list,' which is an accommodation extended to different concerns for their convenience, giving them the privilege of ordering their shipments to different yards,

etc.  When the cars are delivered, the bills are sent and they are paid.  It is conducted just like a general book account.  Our request was, of course, on the condition that those consignees were upon the credit list of the Grand Trunk.  If the parties to whom we directed shipment were not on their credit list, we were willing to prepay the freight.  We have done this before.  Some time in the spring last year we had a disagreement with the Grand Trunk Railway Company with reference to charges.  We disputed their measurements of certain cars upon which the charges are based.  The discrepancies were so great that we refused to pay the charges, and asked them to correct the bill, and they refused to do that.  There were some 88 bills unpaid for that reason, and that resulted in their canceling our credit and at the same time refuse to move any cars.  The dispute was finally settled, but our credit was not restored, although they stated that their reason was not because of any lack of financial standing.  Prior to this dispute we had forwarded cars over the Grand Trunk with charges to follow without objection.

"*Q.* After this dispute and the settlement of it, did they consent to move cars and have charges to follow ?

"*A.* No; they have refused to do so.  The matter of reconsignment of cars with charges to follow has never been in dispute before; the previous trouble being for the reason stated.  We have competitors along the line of the Grand Trunk Railway.  We have purchased material from other concerns along the Grand Trunk last year and have ourselves paid the charges on the reconsignment of these cars to us without objection by the railroad company prior to our dispute with them.  Our purpose in not prepaying charges and to have them follow the cars to their final buyer is because our sand is sold on pit measurement or railroad measurement, and the customers when they settle for the shipment want to see the freight bills before paying to see if they correspond with the pit measurement.  We are always responsible for the freight until it is paid by the reconsignee, but there are about 16 cars that we ordered forwarded that were not delivered, all of them being rejected by the railroad company.  Because of the failure of the railroad company to move cars on our order the orders were canceled."

Respondent's local freight agent testified:

"There were 22 cars that were held up in the latter part of August, or the first part of September, caused by our canceling their credit on account of their delay in settling charges on previous cars. These charges had remained undisposed of for some days. Finally, they paid our charges as rendered except on three cars, making a difference in the charges of about $1. Those cars were standing there all the time until they paid, so that they had opportunities to remeasure them. As far as my knowledge goes, I have had more trouble with them than with any other firm in settling charges. There was $600 of freight money outstanding and in dispute in October."

Relator prays for the writ of mandamus commanding the respondent to move the cars refused and all cars in the future, with charges to follow, so long as such privilege is extended to relator's competitors. Relator relies upon the custom shown as bringing it within the rule of *Gates* v. *Railway Co.*, 151 Mich. 548 (115 N. W. 420), and upon section 17, Act No. 312, Pub. Acts 1907. In the *Gates Case* the contract between the parties was alleged to have been made with reference to the custom then existing between the parties to deliver complainant's logs on defendant's side track in Bay City for transportation to complainant's mill on the Michigan Central. The circuit judge granted the preliminary injunction prayed for, commanding the defendant to deliver cars at the customary place until the further order of the court. Defendant appealed, and, in view of the custom, the temporary inconvenience to defendant and the serious injury to complainant of a contrary holding, this court, for the purpose of maintaining the *status quo* until the final hearing, sustained the trial court.

In the present case the alleged custom, so far as relator was concerned, had only existed from May, 1907, to August, 1908. It did not apply as to all dealers, but only to those who were placed by defendant upon its credit list, and such place did not depend upon contract or other legal right but upon the grace of the defendant. At least, the defendant was entitled to determine for itself to

whom it would extend credit, and, having had serious trouble with relator in collecting its freight charges, we cannot say that it was not justified in striking its name from its credit list. The case is clearly distinguishable from *Gates* v. *Railway Co.*, *supra*. Section 17, Act No. 312, Pub. Acts 1907, provides that: "It shall be unlawful for any common carrier, subject to the provisions of this act, to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation," etc., or subject them "to any undue or unreasonable disadvantage or prejudice in any respect whatsoever." We do not think that the acts complained of give an *undue* or *unreasonable* preference or advantage to relator's competitors or subject relator to an *undue* or *unreasonable* disadvantage or prejudice within the meaning of said section 17. 2 Hutchinson on Carriers (3d Ed.), §§ 567, 799, and cases cited in notes; *Little Rock, etc., R. Co.* v. *St. Louis, etc., R. Co.*, 63 Fed. 775, 11 C. C. A. 417 (26 L. R. A. 192); *Randall* v. *Railroad Co.*, 108 N. C. 612 (13 S. E. 137).

The order of the circuit court is affirmed, and the writ is dismissed.

MONTGOMERY, C. J., and OSTRANDER, HOOKER, and STONE, JJ., concurred.