LITTLE ROCK & M. R. CO. v. ST. LOUIS, I. M. & S. RY. CO., (two cases.)
SAME v. ST. LOUIS S. W. RY. CO., (two cases.)   SAME v. LITTLE
ROCK & FT. S. RY. CO., (two cases.)

(Circuit Court, E. D. Arkansas.   January 5, 1894.)

1. CARRIERS—INTERSTATE COMMERCE ACT — CONNECTING LINES — DISCRIMINA-
TION.
A railroad company is not required by the interstate commerce act,
§ 3, cl. 2, to furnish to competing connecting carriers equal facilities for
the interchange of traffic, when this involves the use of its tracks by such
carriers, and it may still permit such use by one carrier to the entire ex-
clusion of the others.

2. SAME—THROUGH BILLING AND ROUTEING.
Nor is a connecting road which permits through billing and routeing with
one forwarding road obliged to do likewise with another forwarding road,
although the latter possesses all the necessary tracks and terminal facili-
ties; and it may still insist on carrying all freight offered by such road in
its own cars, and to that end require reloading and rebilling at local
rates.

3. SAME—PREPAYMENT OF CHARGES.
Nor does the fact that a connecting road carries freight offered by some
forwarding roads without prepayment of its charges oblige it to do like-
wise with freight offered by other forwarding roads.

These are six suits, of which two are brought against each of the
three defendants; one being at law, and the other in equity.
Heard on demurrers to the bills and complaints.   Demurrers sus-
tained.

Rose, Hemingway & Rose, for plaintiff.
J. M. & J. G. Taylor and Sam. H. West, for defendant St. Louis
S. W. Ry. Co.
Dodge & Johnson, for other defendants.

WILLIAMS, District Judge.   The Little Rock & Memphis Rail-
road Company filed separate bills in equity against the St. Louis,
Iron Mountain & Southern Railway Company and the Little Rock
& Ft. Smith Railway Company.   The bills are substantially alike
as to allegations of fact, as well as the prayers for relief. At the same
time the plaintiff company filed complaints at law against the same
companies.   The complaints at law are couched in substantially the
same words as are used in the bills in equity.

It is stated in the bills that the plaintiff and defendants are
corporations owning and operating railroads under the laws of
the state of Arkansas; that all of the railroads mentioned are en-
gaged in interstate commerce; and the termini of the respective
roads are stated.   The wrong complained of is—

"That the defendant refuses to receive any freight from your orator, except
upon the prepayment of all charges thereon, at the same time that it receives
freight from all other persons and corporations without demanding the pay-
ment of freight charges, but collecting such charges upon the delivery of the
goods, as is customary in the railroad business."

In the other case the language is somewhat different, and is as
follows:

"The defendant company, for the purpose of injuring and oppressing your orator, refuses to accept interstate freight at Little Rock upon through billing from the line of your orator, in conjunction with the defendant's line, at the same time that it accepts freight upon through billing from all other lines of railroad terminating at the city of Little Rock, and it refuses to accept freight from your orator except upon a prepayment of all freight charges, at the same time that it accepts freight from all other individuals and corporations without the prepayment of freight charges, collecting its freight charges, as is customary with railroad companies, upon the delivery of the freight at its destination; that the St. Louis, Iron Mountain & Southern Railway Company, a corporation organized under the laws of the state of Arkansas, and likewise engaged in the business of interstate commerce, has a line from Memphis to Little Rock, and parallel to that of your orator, and for the like purpose of oppressing and injuring your orator the defendant accepts from said company passengers on through tickets at greatly reduced rates, and with through checking of baggage, at the same time that it refuses to accept passengers over your orator's lines at through rates, but charges to such passengers local rates, and requires them to recheck their baggage at Little Rock."

To these bills, demurrers have been interposed, upon the ground that no cause of action is stated therein, and because there is no equity in the bills. The defendants urge that the questions presented by the bills have all been settled adversely to the plaintiff by this and other courts. The plaintiff insists that the law, as applicable to the facts now presented, has not been settled by any court, and undertakes to distinguish the cases at bar from the cases cited by defendants. To the end that the contention of the plaintiff may be stated fairly, I will state its exact position, as found in the brief of counsel, which is:

"Both cases are brought under the act to regulate commerce, approved February 4, 1887, as amended by the act of March 2, 1889. The second clause of the third section bears directly upon the question; and to it, as construed in the light of other provisions, we must look for a solution of the questions presented in these cases. It reads as follows:

"'Every common carrier, subject to the provisions of this act, shall, according to their respective powers, afford all reasonable, proper and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines, but this shall not be construed as requiring any such common carrier to give the use of its tracks, or terminal facilities, to another carrier engaged in a like business.'

"The requirements of the clause are four; three mandatory, and one prohibitory. Of the mandatory provisions, two relate to all connecting carriers, without reference to the existence or nonexistence of competing lines. The others apply only to the duty of the carrier in its relation to competing carriers. In the first place, it is made the duty of all carriers coming within the act to afford all reasonable and proper facilities for the interchange of traffic; and it must do this whether it connects with one line only, or with competing lines. The third requirement demands that the reasonable and proper facilities afforded shall also be equal, and the fourth prohibits discrimination among competing lines in rates and charges. It is not necessary to consider, in this case, the duty of the carrier under the first two requirements. The defendant determined what were reasonable and proper facilities for the interchange of traffic, and we do not complain of the determination reached. The basis of our complaint is that the facilities afforded have not been equal, and that the defendant has discriminated against the plaintiff, in withholding from it facilities afforded to competitors of the plaintiff connecting with defendant under the same circumstances and conditions as plaintiff. * * * The court is not required to determine what contract would be reasonable. That has been fixed by the defendant in its contract with the plaintiff's com-

petitors. And, as the plaintiff does not controvert the reasonableness of the terms of that contract, it is necessary only for the court to coerce the defendant to give the plaintiff the benefit of it."

In Little Rock & M. R. Co. v. East Tennessee, V. & G. R. Co., 47 Fed. 771, Judge Hammond, in delivering the opinion of the court, said:

"If this bill averred that the East Tennessee, Virginia & Georgia Railway refused to give passengers going over the Little Rock & Memphis Railroad the same rates and facilities, including through tickets and traffic transfers, that it affords to the Iron Mountain road for passengers going to Little Rock, or any other point·on the plaintiff's road, the court would not hesitate to say that it would be a violation of this [third] section of the interstate commerce act."

The state of case to which this language was applied was not made by the bill, nor had counsel been heard upon that state of facts. Plaintiff, however, insists that that precise state of case is now made by the bills before the court, and that the law, as announced by Judge Hammond, is applicable to it. Plaintiff further urges that the law applicable to the facts, as presented by the bill, is declared in New York & N. Ry. Co. v. New York & N. E. R. Co., 4 Interst. Commerce Com. R. 702, where it is claimed it has been decided—

"That·when a railroad connects with two competitors, under substantially similar conditions, even at points a little apart, that, if it makes through rates with one, it must make the same with the other, and that this duty is enforceable."

The relief asked is—

"That the said defendant be enjoined from further discriminating against your orator, and that it be required to afford your orator the same facilities and conveniences in the transaction of business that it affords to other corporations and individuals."

The concluding portion of the third section· of the act, under which the plaintiff asks relief, declares:

"But this shall not be construed as requiring any such common carrier to give· the use of its tracks, or terminal facilities, to another carrier engaged in like business."

It is clear from this language, that none of the grants, if they may be called such, in the preceding portion of the section, include, or were intended to include, the use of the tracks or terminal facilities of the receiving railway company. Therefore, in construing the section, we must at all times look to see whether what is asked includes the use of the defendant's tracks and terminal facilities. If it does, the law itself denies the prayer. In short, in ascertaining whether "equal facilities" have been denied, and whether "discrimination" exists, the court is not·to call that a discrimination which arises from a refusal to permit the forwarding company to perform an act which involves the use of the tracks and terminal facilities of the receiving company, nor shall the court declare that to be a denial of "equal facilities" which flows from a refusal to a forwarding company to perform an act which involves the use of the track or terminal facilities of the receiving company. In Kentucky & I. Bridge·Co. v. Louisville & N. Ry. Co., 37 Fed. 567, in construing

the third section of the act, to which the plaintiff has appealed, Judge Jackson says:

"The provision in the third section of the act to the effect that a common carrier shall not be required 'to give the use of its tracks and terminal facilities to another carrier engaged in like business' is a limitation upon, or qualification of, the duty of affording all reasonable, proper, and equal facilities for the interchange, or for the receiving, forwarding, and delivering of traffic to, from, and between connecting lines; and therefore it is left open to any common carrier to contract or to enter into arrangements for the use of its tracks and terminal facilities with one or more connecting lines without subjecting itself to the charge of giving an undue or unreasonable preference or advantage to such line, or of discrimination against other carriers who are not parties to, or included in, such arrangements. No common carrier can, therefore, justly complain of another that it is not allowed the use of the other's tracks and terminal facilities upon the same or like terms and conditions which, under private contract or agreement, are conceded to other lines."

The point of connection of the plaintiff's railway with that of the defendant is not stated in the bill with any more accuracy than that it is at Little Rock. Nor is it stated that at the point of connection, or near thereto, the plaintiff company has facilities, in the way of tracks, switches, yards, and depots, for the interchange of interstate traffic, equal to those possessed by the Iron Mountain road at its connection with the defendant's railway. Judge Jackson, in speaking of that condition of affairs, in the same case, says:

"It by no means follows, because certain facilities for the interchange of freight are furnished by a railroad to another connecting line or lines, at one point, upon certain terms, conditions, and considerations, and where ample accommodations for the transaction of such business are provided and maintained at the joint expense of the companies using them, that another company, making physical connection with the road furnishing such facilities, at another, different, and distant place, is entitled to demand, at said different point of connection, the same or equal facilities. The company making the physical connection at a point other than that at which the established road has already provided its facilities, and conducts its interchange with other connecting lines, cannot demand or require an interchange at such point of physical connection without first furnishing at such point reasonable and proper facilities for the interchange sought. It cannot rely upon the terminal facilities at another point of the road with which it has formed the physical connection, nor can it compel the road with which the connection is made to join with it in the expense of providing at that point the facilities necessary and proper for the interchange."

In Oregon Short Line & U. N. Ry. Co. v. Northern Pac. Ry. Co., 51 Fed. 465,—a case having many of the phases of the cases at bar,—Judge Field, in construing the third section of the act of March 2, 1889, said:

"The first subdivision of this section does not make all preferences or advantages which may be given by a common carrier unlawful. Only those which are undue or unreasonable are forbidden. The second subdivision is similarly guarded in its provisions. Common carriers are there only required, according to their respective powers, to afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and are forbidden to discriminate in their rates and charges between them; and even this provision is subject to the limitation that it shall not be construed as requiring any common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business."

After having made this statement, the learned justice continues by quoting approvingly from the opinion of Judge Jackson in Kentucky & I. Bridge Co. v. Louisville & N. Ry. Co., 37 Fed. 624, where it is said:

"No provision of the interstate commerce act confers equal facilities upon connecting lines, under dissimilar circumstances and conditions. \* \* \* The provision in the second subdivision of the third section of the interstate commerce act, that a common carrier shall not be required to give the use of its tracks and terminal facilities to another carrier engaged in a like business, is a limitation upon, or qualification of, the duty declared of affording all reasonable, proper, and equal facilities for the interchange of traffic, and the receiving, forwarding, and delivering of passengers and property to and from the several lines, and those connecting therewith. It follows from this, as was decided in that case, (Kentucky & I. Bridge Co. v. Louisville & N. Ry. Co.,) that a common carrier is left free to enter into arrangements for the use of its tracks or terminal facilities with one or more connecting lines without subjecting itself to the charge of giving undue or unreasonable preferences or advantages to such lines, or of unlawfully discriminating against other carriers. In making arrangements for such use by other companies, a common carrier will be governed by considerations of what is best for its own interests. The act does not purport to divest the railway carrier of its exclusive right to control its own affairs, except in the specific particulars indicated."

These adjudications establish four propositions: First, that the tracks and terminal facilities of the defendants can only be used by the plaintiff railway for the exchange of interstate freight, with the consent of the defendants; second, that no common carrier can justly complain of another because it is not allowed the use of the tracks and terminal facilities of such other railway company in the same manner and to the same extent another is; third, that the fact that one connecting railway company has a contract for the interchange of interstate commerce freight, which involves the use of the receiving railway's tracks and terminal facilities, would not authorize a court of equity to compel the receiving railway to grant a like contract or concession to another connecting company; fourth, that the connecting railway company, desiring an interchange of freight and passengers, cannot demand, as a matter of right, an interchange of freight at the point of physical connection without first furnishing at such point reasonable and proper facilities for the interchange sought, and cannot rely upon the terminal facilities at another point, nor compel the receiving railway to go to any expense of providing proper facilities at the point of physical connection. These propositions having been established by two justices of the supreme court, I have no disposition to disregard their construction of the interstate commerce act. There is nothing in the bills from which it may be inferred that the plaintiff owns, or has the proper, or any, facilities for the interchange of interstate commerce freight.

The effect of granting the relief asked would be to put the plaintiff in a position where it could receive interstate freight at Memphis, Tenn., destined to Ft. Smith, Ark., bring such freight a distance of 135 miles, to Little Rock, over its own line, and deliver it to the Little Rock & Ft. Smith road, to be taken a further distance of 165 miles. In a case of that kind, by whom and how is the rate to be fixed from Little Rock to Ft. Smith? The plaintiff answers:

"By the same rate the defendant would receive if the freight had been brought by the Iron Mountain road from Memphis to Little Rock. That the compensation must be the same."

The answer savors of equity, and is certainly persuasive; but the contract existing between the Little Rock & Ft. Smith Railway and the Iron Mountain Railway may have been based upon the use of the tracks, switches, yards, stations, depots, and terminal facilities granted by one of these roads to the other, and, if so, it would not furnish a guide for any rate. But suppose the contract was not based upon any of these considerations. Has a court of equity, under the interstate commerce act, been clothed with the power to compel the receiving company, which has made a contract or agreement with another connecting and competing company, to establish the same rate, as against the receiving company, at the instance of a railway company with which there is no contract, and compel the receiving company to accept that rate?

It is said that this precise question was decided by the interstate commerce commission in New York & N. R. Co. v. New York & N. E. R. Co., 4 Interst. Commerce Com. R. 702. While such a decision, in the absence of adjudications by the courts, is entitled to great respect, and while it might be persuasive, if it went to the extent claimed for it, such decisions are not binding on this court. In the cases of the plaintiff against the East Tennessee, Virginia & Georgia Railway Company and the St. Louis, Iron Mountain & Southern Railway Company, (3 Interst. Commerce Com. R. 16,) Judge Walker, in speaking for the commission upon the question of whether, under the interstate commerce act, a compulsory through routing and through rating had been provided for by that act, said:

"The facts in the present case clearly develop the importance of such an amendment, or of some amendment which shall provide a mode of procedure for carrying into effect the establishment of through routes and through rates, and the equitable apportionment of the rate established, in case where the refusal of such routes and rates works an unlawful preference. As the statute now stands, there is no way apparent in which practical relief can be afforded to the complainant, without authority to provide for the necessary divisions being conferred, either upon the commission, the courts, or some other tribunal."

It appears from this that under the act, as it then stood, there was no authority "to provide for the necessary divisions" conferred either upon the commission, the courts, or other tribunal. The act has not been amended since that expression of opinion, although congress has been appealed to to amend it so as to confer that power on the commission and courts. If it be true that the act does not confer the power on any tribunal to provide for the necessary divisions growing out of a through routing and a through rating, that ends the matter. The fact that the receiving company has fixed a through routing and a through rating by contract or agreement with another connecting company neither extends the jurisdiction of this court, nor confers upon it powers under the act which it did not have before. Ascertaining the rule by which the rights of litigants, and the damages consequent upon their invasion, may be measured, is one thing; and ascertaining whether the court has

jurisdiction to use the measure offered, or any other, is quite another.

The supreme court of the United States, in Atchison, T. & S. F. Ry. Co. v. Denver & N. O. Ry. Co., 110 U. S. 682, 4 Sup. Ct. 185, held that the refusal of a common carrier to make through traffic arrangements at or upon joint rates with one connecting railroad company, such as it makes or enters into with another connecting line, does not constitute any undue or unreasonable discrimination in charges or facilities. It is true that decision was rendered before the enactment of the interstate commerce act. But Judge Jackson, in the Kentucky & I. Bridge Co. Case, after quoting what the court had decided, said: '.

> "That decision is conclusive of the present question, unless some provision of the act to regulate commerce has expressly, or by clear implication, provided otherwise. It is insisted for the petitioner that such is the case, and that the second clause of the third section of that act, in connection with section 5258, Rev. St. U. S., has established a different rule and regulation from that announced in the above decision."

After stating that neither section 5258 nor the interstate commerce act had changed the common-law rule in relation to common carriers, the learned judge asks:

> "Is it a public duty, imposed by the act to regulate commerce, that every common carrier subject to the provisions of that law shall concede or afford through routing and through rates to all connecting lines whenever and so long as it voluntarily makes or enters into such arrangements with connecting lines? After a careful examination of the act, and the argument of counsel and authorities cited, we fail to discover any such requirement. * * * Such arrangements, which usually include the reciprocal interchange of cars and the use of each other's tracks and terminal facilities, are prompted by considerations varied and complex, as shown in the above statement of facts. In some instances, and between some companies, they may be mutually desirable and beneficial, while in other cases, and with other connecting lines, they might be prejudicial and injurious to the interests of one or both. Can companies in the latter situation (that is, those with whom a connection might be prejudicial or injurious) properly claim, as a matter of right, what the former have acquired under and by virtue of private contract and arrangement? No provision of the law, rightly construed, sanctions or supports such a proposition. The statute does not undertake to create, between connecting lines, such an agency or quasi partnership relation as is necessarily involved in agreements or arrangements for the establishment of through rates, as such arrangements exist by contract, express or implied. The fact that a common carrier enters into them with one or more connecting lines does not impose upon such carrier the duty or obligation to make the same or like contracts with all other lines."

One of the things complained of is that the defendant railway refuses to accept interstate freight upon through billing in conjunction with the plaintiff's line, and accepts such freight on through billing in conjunction with all other lines of railroad terminating at Little Rock. This is but another way of stating that one railway company has, by contract or agreement, acquired an arrangement for a through routing and a through rating with the defendant company, and that the defendant company refuses to make a like contract with the plaintiff, and, because it will not, it should be compelled by mandatory injunction to so do. This court possesses no such power. The bills do not allege whether the freight refused was in cars belonging to the plaintiff, or other railway corporations

other than the defendants, or whether the defendants were without cars of their own in which to carry such freight. It was urged before Justice Field, in the Oregon Case, that there was a custom among railways to receive freight from connecting lines, and not demand the prepayment of freight, and the alleged custom was pleaded as the foundation of a right, and in response to that he says:

"There is no law or custom requiring a railway company receiving freight from a connecting line to advance, or assume the payment of, charges thereon for the transportation from its origin to the connecting line. * * * A railway company, like any other common carrier, has a right to demand that its charges for transporting shall be paid in advance, and it is under no obligations to receive goods for transportation unless such charges are paid, if demanded."

It follows that if the receiving railway company is under no obligations to receive freight unless the prepayment of freight charges is tendered, if payment is demanded, and if there be no law or custom requiring it to do so, no right can grow out of an alleged law or custom which does not exist. A railway company may, undoubtedly, waive the right of prepayment, and retain a lien upon the goods until payment is made, and, in case of delivery before payment, may hold the consignee responsible, or it may refuse to do either, and demand prepayment. The exercise of these rights, or the waiver of some of them, at different times, can no more be construed to be a denial of "equal facilities," or a "discrimination," than it would be on the part of an hotel keeper to require some of his guests to pay in advance, and allow others to pay when they had concluded their stay at the hotel.

At the same time the bills were filed in the cases to which attention has thus far been directed, a bill was also filed against the St. Louis Southwestern Railway Company by the plaintiff. The only difference in the bills is that in the last-mentioned bill there is an averment which is not in the others, to wit:

"The lines of railway of your orator and the defendant intersect at the town of Brinkley, at which place switches, and all other conveniences for the interchange of traffic, have been established; that the St. Louis, Iron Mountain & Southern Railway owns a line that parallels that of your orator, about thirty miles north of Brinkley, which extends from Memphis westward; that the defendant refuses to receive freight or passengers coming over your orator's line, except at local rates, and refuses to honor through tickets or through bills of lading over the line of your orator in conjunction with its own, but requires all freight to be rebilled and reloaded, and all passengers to purchase new tickets, at the said town of Brinkley, while, at the same time, it issues and accepts through tickets and through bills of lading from other railway companies," etc.

That the plaintiff has the facilities at Brinkley for an interchange of interstate commerce freight, (an allegation not contained in the other bills,) is distinctly alleged, but the bill shows that the defendant requires the freight offered to be rebilled and reloaded. The inference is that the plaintiff tendered the freight in its own cars, and the defendant declined to take it in that condition, as it had cars of its own, in which it preferred or desired to carry the freight. The refusal was, not to transport the freight, but to transport it in the cars of the plaintiff, or in the cars of others. That

precise question was presented in the Oregon Case, and Justice Field, speaking for the court, said:

"Its chief contention is that the defendant, as a common carrier by railway of freight and passengers, is obliged—First, to receive freight tendered to it by the complainant at Portland, Or., (that being a point where it connects with the road of the complainant,) in the cars in which it is tendered, and transport the same to the point of destination in such cars, over its road, and pay to the company owning the cars the current rate of mileage for their use, and also pay the charges for transportation from the point of origin to Portland; second, to honor tickets or coupons for passage over its lines, north of Portland, issued by the complainant. This obligation of the defendant is asserted on three grounds: First, the alleged established custom between railroad companies operating connecting lines; second, the third section of the interstate commerce act; and, third, the fifth section of the defendant's charter. * * * As the receiving company is under no obligations to take the freight in cars in which it is tendered, and transport it in such cars, when it has cars of it own, not in use, to transport it, there can be no question that it shall pay the owner of such cars, should it receive them in such case, car mileage for their use. The car mileage, in that case, must be upon an arrangement between the parties."

It would seem from this case that the defendant had the right, if it had unemployed cars of its own, which is not negatived by any allegation in the bill, to carry the freight in its own cars, and to refuse to pay for the use of cars it did not need in the conduct of its business. Prior to the enactment of the interstate commerce act, it would hardly have been contended that a connecting railway company would have had a remedy in equity, to compel the company with which the connection was made to accept freight in the cars of other companies than its own, and transport the same to a point of destination on its line, or that a remedy at law, for damages for such refusal, existed. It seems to me that to allow the plaintiff company to load one or more of its cars at Memphis, Tenn., with freight to Ft. Smith, Ark., bring it to Little Rock, and compel the Little Rock & Ft. Smith Railway to transport the cars to Ft. Smith, without any agreement as to rates, and without the Little Rock & Ft. Smith Railway having any privilege to haul the freight in its own cars, would be giving the plaintiff the absolute use of the tracks of the defendant, to enable the plaintiff to carry on an interstate commerce business. The "use of the tracks" of a common carrier for such a purpose is denied, in express terms, by the concluding clause of section 3 of the act. If it may thus tender cars of freight for transportation, it is difficult to see why the locomotive and tender should be detached from such cars. If a court of equity, by mandatory process, has the power to compel the receiving company to accept and transport interstate commerce freight in other cars than its own, it has the same right to say that such cars shall, if it will facilitate the business of delivery, be transported to the point of destination with and by the same motive power that brought them to the connecting road. The running of freight cars over the track of another railroad, without its consent, is just as much "use of the tracks" as if the locomotive was attached.

I have given these causes my best consideration, and it seems to me that if the court undertakes to adopt a rate agreed upon between

the defendants and other connecting companies, or any other rate, the court would be making a contract which the law does not authorize it to make, between the plaintiff and defendants. In Atchison, T. & S. F. Ry. Co. v. Denver & N. O. Ry. Co., 110 U. S. 679, 4 Sup. Ct. 185, the court said:

"A court of equity is not, any more than a court of law, clothed with legislative power. It may enforce, in its own appropriate way, the specific performance of an existing legal obligation, arising out of contract, law, or usage, but it cannot create the obligation."

In the Express Cases, 117 U. S. 1, 6 Sup. Ct. 542, 628, the court below had rendered just such a decree, in form, as this court is now asked to make, and the court said:

"Having found that the railroad company should furnish the express company with facilities for business, it had to define what those facilities must be; and it did so by declaring that they should be furnished to the same extent and upon the same trains that the company afforded to itself, or to any other company engaged in conducting an express business on its line. It then prescribed the time and manner of making the payment for the facilities, and how the payment should be secured, as well as how it should be measured. Thus, by the decrees, these railroad companies are compelled to carry these express companies, at these rates and these terms, so long as they ask to be so carried. * * * In this way, it seems to us, the court has made an arrangement for the business intercourse of these companies, such, as in its opinion, they ought to have made themselves. * * * The regulation of matters of this kind is legislative in its character, not judicial. To what extent it must come, if it comes at all, from congress, and to what extent it may come from the states, are questions we do not now undertake to decide; but that it must come, when it does come, from some source of legislative power, we do not doubt."

If a decree was entered in this case in favor of the plaintiff, would it not have to be in substantially the same language as the decree in the Express Cases—

"To accord to the plaintiff the same facilities, in the matter of the interchange of interstate commerce freight, that the defendant accords to other companies connecting with defendant's railway, as to freight delivered to defendants at Little Rock, and destined to Ft. Smith."

Suppose there were three or more railways connecting with the Little Rock & Ft. Smith Railway at Little Rock, all engaged in interstate commerce, and that two of them had contracts with that company for through routing and through rating, and that these contracts were dissimilar as to rates and charges. Which of the rates would the court be compelled to accept, when it undertook to decree a rate for the plaintiff? But admit they should be found to be alike, and that the court should adopt the rate so found, and that the contracts were to expire on the 1st day of January next, and that after that time the rate, by contract, should be increased. Is this litigation to remain open as long as these corporations exist, and interstate commerce continues, and is the court to make orders from time to time to meet the varying changes? Again, suppose the contracts shall not be renewed at all. Could the defendant come into this court, and plead the expiration of the contracts, and have the mandatory injunction set aside? If it could, does that not show that the power of the court to act in the first instance de-

pended, not upon any provision of the interstate commerce act, but upon evidence by which an equitable rate might be ascertained?

In Little Rock & M. R. Co. v. St. Louis, I. M. & S. Ry. Co., 41 Fed. 559,—a case involving a construction of the third section of the interstate commerce act, and many of the questions now presented,—Judge Caldwell, in delivering the opinion of the court, said:

"The precise question in this case is, can the United States circuit court, in the exercise of its equity powers, require a railroad company engaged in interstate commerce traffic to enter into an agreement with another railroad company, engaged in like traffic, for a joint through routing and joint through rates; and, upon the refusal of the company to comply with such a requirement, may the court itself make such a contract for the parties?"

The question is answered in the negative. The fact that in the case at bar there exists a contract with another company for similar services, while that was not true in the other case, cannot confer jurisdiction in this case, if there was none in the other. Through routing and through rating cannot be effected without the use of the tracks of the companies creating the through routing and rating. Such contracts are entered into for the very reason that they do away with rebilling and reloading freight, and give to the parties to the arrangement the use of each other's cars and tracks for the purpose of forwarding the freight from its origin to its destination without breaking bulk. If this be true, and if it also be true that nothing contained in the third section of the interstate commerce act is to be so construed as "requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in a like business," where does the court get the power to say, in the absence of a contract giving the plaintiff such a right, that it shall have the use of the defendants' tracks in order to aid it in carrying on interstate commerce traffic? The prayer of the bills cannot be granted without compelling the defendants to permit the plaintiff to run its own, or cars other than those of the defendants, over their tracks. To stop the cars at the point of physical connection, and reload the freight into the cars of the receiving company, is to break a through routing; and to break a through routing is to break a through rating.

Being of opinion that the defendants are not required to allow the plaintiff the use of their tracks for the purpose of enabling the plaintiff to do an interstate commerce business, and that the relief asked cannot be granted without the use of the defendants' tracks, and compelling the defendants to haul freight, in other cars than their own, over their own tracks, and at a less rate than they would receive, or be entitled to receive, if the freight was hauled in their own cars, I cannot see my way clear to grant the relief asked.

The demurrers to the bills, as well as those to the complaints at law, are sustained.