POST    v.    RAILROAD.

(*Jackson.*    May    27,    1899.)

1. EVIDENCE.    *Admissible under scope of pleadings, when.*

A bill charging that the action of a railroad was due to an agreement between itself and other carriers, the terms of which are unknown to the complainant, but whose tenor was to restrain trade and commerce, is broad enough to let in full evidence as to what was done at a meeting at which the agreement was made, and what policies were there outlined, and of the division of traffic, if any, there made, and the circumstances connected with it.    (*Post, pp. 200, 201.*)

2. COMMON CARRIER.    *Designation of route for through shipments.*

The right to designate the route of through shipments at through rates lower than local rates belongs to the carrier; and not to the shipper, in the absence of any sufficient or controlling reason to the contrary.    (*Post, pp. 202–215.*)

Cases cited: Trans. Co. v. Bloch Bros., 86 Tenn., 415; Bird v. Railroad, 99 Tenn., 719; Railroad v. Brumley, 5 Lea, 401; Dillard Bros. v. Railroad, 2 Lea, 288; Tel. Co. v. Munford, 87 Tenn., 190; Railroad v. Odill, 96 Tenn., 61.

3. SAME.    *Same.*

An illegal advantage to a shipper over other shippers, by way of rebates from a fast freight line, will not be ground for giving him the right, as against other carriers, to designate the route for a through shipment at through rates.    (*Post, pp. 216, 219, 220.*)

4. SAME.    *Same.*

The carrier's right to select the route for through shipments does not extend to the selection of insolvent lines, or uncertain or unreliable agencies.    (*Post, pp. 220.*)

5. SAME.    *Unlawful combinations.*

A declaration of policy made by each of several carriers at a meeting, which is simply an expression of a right which the

Post *v.* Railroad.

carriers had without such declaration, and which is not made for an illegal purpose, and does not operate prejudicially to shippers, although it declares that rates are not to be reduced, does not constitute an unlawful combination, where the rates referred to are reasonable rates, which have resulted from free competition. (*Post, pp. 221–223.*)

6. SAME. *Same.*

An injunction against observing a declaration of policy by carriers, will not be granted on the ground that it may be made the basis of illegal acts and practices thereafter, when they are not its direct and necessary effect. (*Post, pp. 223–226.*)

7. SAME. *Not partners.*

An agreement among several connecting carriers regarding through shipments does not constitute them a partnership. (*Post, pp. 226, 227.*)

8. INJUNCTION. *Mandatory granted, when.*

A mandatory injunction will not be granted except in extreme cases, and when Courts of Law are unable to afford adequate redress, or when the injuries complained of cannot be compensated in damages. (*Post, p. 216.*)

9. SAME. *Anti-trust laws not enforced by.*

The anti-trust statutes, State and Federal, are not enforceable by mandatory injunction, at the instance of a private party. (*Post, pp. 225, 231.*)

---

### FROM SHELBY.

---

Appeal from Chancery Court of Shelby County. LEE THORNTON, Ch.

CARROLL & McKELLAR for Post.

W. A. HENDERSON and F. P. POSTON for Railroad.

WILKES, J.   This bill was filed in the Chancery Court of Shelby County, on February 17, 1899, by John A. Post & Co. and ten other firms of cotton shippers, named in the bill, against the Southern Railway Co., to compel it by mandatory injunction to issue its bills of lading for cotton tendered it by complainants for transportation to New England points, with the routing, or lines of connecting carriers, selected by complainants inserted therein.   The material allegations of the bill are:   That on the day named the Southern Railway Co., a corporation under the laws of Virginia, was operating its line of railway from Memphis, Tennessee, to Alexandria, Virginia, having a "joint freight tariff in connection with, among other railroads, the Pennsylvania Railroad and the New York, New Haven & Hartford Railroad, thus forming a continuous line from the city of Memphis to the city of Fall River, Massachusetts," and that the joint freight tariff provided for a through rate from Memphis, and over the lines named, on uncompressed cotton, and was certified to conformably to the interstate commerce law, and concurrent over the lines named, at the prescribed rate of $50\frac{1}{2}$ cents per one hundred pounds, which, by agreement between the several carriers named, was to be divided *inter sese.*   That on the 17th of February, 1899, the complainants tendered to defendant twenty-four bales of cotton, marked "D.

Z. S.," with the following shipping directions, viz.: Via defendant's line to Alexandria, thence via Pennsylvania Railroad to Jersey City, N. J.; and thence via the New York, New Haven & Hartford Railroad to Fall River, Mass., its destination, and requested that it issue its usual bill of lading, with the said routing inserted, at the said joint tariff rate of 50½ cents, which defendant refused, claiming itself the right to say over what connecting line it should be transported. That the defendant and the other lines named had all necessary facilities for carrying said cotton and had no legal excuse for refusing to accept it and issue its bill of lading with the routing selected by complainants therein. That this refusal was due to a secret agreement made at New Orleans, the terms of which are unknown to complainants, the tenor of which was to restrain trade and commerce, and was entered into between all the lines of railroad initial at Memphis, and applicable to no other than cotton shipments from Memphis, and violated the laws of the United States—*i. e.,* the Sherman anti-trust Act—and the statutes of Tennessee; it was an illegal discrimination against Memphis, and against a particular class of shipments. That complainants have been cotton shippers for many years, buying for Eastern mills, many of whom require cotton to be shipped over certain designated lines. That they have, since the alleged agreement, re-

peatedly tendered to defendant, and other railroads at Memphis, shipments of cotton, with routing given, and demanded bills of landing therefor, which were refused; and that the conduct of defendant has been oppressive, continued, and repeated, and has caused them irreparable loss and damage. That defendant had, prior to said agreement, received for them cotton for Eastern points with such routing as they selected inserted in the bill of lading. The bill claims the right on the part of the shipper to compel the defendant to receive, issue its bills of lading for, and transport, over such connecting lines as complainants may select, all cotton tendered by them. The prayer was for the issue of a mandatory injunction requiring defendant to receive the twenty-four bales tendered, issue its bills of lading therefor with shipping directions inserted, and requiring it to receive all cotton tendered by complainants in future on their customary bill of lading, and that it be made perpetual on final hearing, and for general relief. The injunction as prayed issued.

Defendant filed its demurrer and answer to said bill. The demurrer contained three grounds; the first, that there is no equity in the bill; second, want of jurisdiction of the subject-matter, and that the remedy, if any, was in the Circuit Court of the United States. The third was to the effect that defendant company cannot be re-

quired, against its consent, by the complainants herein or the Court to accept the routing given by the complainants for the transportation of said freights as set out in the bill, but the routes and agencies to be selected for such transportation beyond Alexandria, Va., were and are wholly within the defendant's control, which was overruled by the Court. The answer of defendant, coupled with the demurrer, admitted its corporate existence and ownership of the line from Memphis to Alexandria; that the joint through freight tariff alleged in the bill has been established, and was in force on February 17th, having been filed with and approved by the Interstate Commerce Commission, and provided for a joint tariff rate of $50\frac{1}{2}$ cents per one hundred pounds on uncompressed cotton from Memphis to Fall River, Mass., over the lines indicated; that it does not know, and cannot admit the averment, that the other railroad lines named in said tariff have certified their acceptance of it to the commission, as required by law, and demands proof; that by said tariff defendant and the other lines named agreed to a division of the rate *inter sese*. Defendant alleges that by other provisions of the same tariff deliveries of cotton could be made by it to the Pennsylvania Railroad for delivery to Fall River, Mass., under said tariff, and at the through rate, either at Hagerstown, Md., over the Norfolk & Western Railway, or at Pinner's

Point, Va., to be used as the exigencies of the business might require; and that it had the right to select the connecting line over which the same should be carried. The tender of the twenty-four bales of cotton alleged in the bill is admitted, as it admitted defendant's refusal to receive it and issue bills of lading under the conditions demanded by complainants; but defendant says at the time of this refusal to allow complainants to route said cotton through to destination, it was ready, willing, and offered to receive said twenty-four bales, and any other cotton that might be offered, and safely and promptly carry it to Alexandria, Va., and deliver it to any person or carrier the shipper might name, issuing, however, only its local bill of lading, and charging local freight rates on such shipments, recognizing, as it always has, the shipper's right to send any freight to any point on this line, and have it delivered as the shipper might elect, but denying that in cases where freight was to be shipped to a point beyond its own line it could be compelled at all to issue its through bill of lading therefor, except at its option, and subject to such reasonable conditions as it might impose; that the rate shown in tariff of 50½ cents is much lower than the combined local rates on each line would be, and these reduced rates can only be given by arrangements with the several carriers composing the through line, and cannot be made

Post v. Railroad.

for any length of time, but are continually changing to meet the necessities of the business. The defendant gives many reasons why it should be allowed to route feight, viz.: Solvency of connections; ability to handle freight promptly; willingness and ability to settle claims growing out of shipments promptly; selection of lines with the view of having them return defendant's cars from the east loaded, or reciprocity in business relations; a particular line may at any time become disabled or congested, so as to be unable to move freight promptly; defendant may be required to send its cars over lines which will not return them, or pay milage or return any business on them, while the lines selected by defendant may do all this, and it should be left free to make its own selections and arrangements. The refusal to receive the twenty-four bales of cotton upon the distinct ground that the shipper did not have the right to select, and defendant could not be compelled, on through shipments beyond its line, to issue through bills of lading over the connecting carriers, is admitted. Defendant denies that it has done anything not authorized by law or that it has violated any law; denies that there was any agreement at New Orleans touching the routing of cotton, or that, if there had been, it violated any law, State or national; denies that it has been guilty of discrimination against complainants, or Memphis as a market,

or cotton as a product, or that it has ever per-
mitted shippers to route cotton at Memphis or
elsewhere. The averments of the bill in regard
to repeated tenders of cotton by, irreparable loss
and damage to, and discrimination against com-
plainants are denied. In short, all the material
averments are put in issue, and defendant insists
that under the law it has the right to refuse
to receive cotton or anything else, and to refuse
to issue its through bill of lading therefor be-
yond its own line unless it may select the
agencies by which it will be carried.

Considerable proof was taken in the case, and,
on final hearing, the Court below decreed "that
the complainants are entitled to have their cotton
accepted and received by the defendant, and trans-
ported over its line and over the connecting lines of
defendant, as designated in the bill herein, to Alex-
andria, Va., and thence over the Pennsylvania
Railroad to Jersey City, and thence over the New
York, New Haven & Hartford Railroad to desti-
nation, as complainants may so designate their
cotton to be shipped, where the defendant has
through tariff arrangements with such designated
connections, and complainants tendering the pub-
lished through tariff rate, and demanding the
usual and customary bill of lading therefor;" and
held further "that the provisional mandatory in-
junction heretofore issued in this case, requiring
the defendant to accept and transport complain-

ants' cotton upon the condition and consideration hereinbefore mentioned, be made perpetual," from which defendant prayed and perfected an appeal to this Court, and now makes the following assignment of errors:

"*First.*—The Court erred in overruling the third ground of demurrer filed by defendant, to the effect that it could not be compelled to accept the routing given by complainants for the transportation of cotton as claimed by them, but that the routes and agencies to be selected for the transportation thereof beyond its own lines was and is a matter wholly within the control of demurrant.

"*Second.*—The Court erred in decreeing that the complainants were entitled to have their cotton accepted and received by the defendant, and transported over its line and over the connecting lines of defendant, as designated in the bill, to Alexandria, Va., and thence over the Pennsylvania Railroad to Jersey City, and thence over the New York, New Haven & Hartford Railroad to destination, with the routing to be selected by the complainants inserted in the bill of lading issued therefor, and to have issued to them the customary bill of lading therefor.

"*Third.*—The Court should have held, and erred in refusing to hold, that the defendant railway company had the legal right, where cotton destined for shipment to points beyond its own line

19 P—13

was tendered to it for transportation, to select and name, and transport the same over such connecting lines beyond its own line as it might select and choose to use.

"*Fourth.*—The Court erred in adjudging and decreeing that the provisional mandatory injunction preliminarily granted in this cause, requiring the defendant to accept and transport cotton tendered it by complainants over such connecting lines as they might choose to select, be made perpetual.

"*Fifth.*—The Court should have held, and erred in refusing to hold, that complainants were entitled to no relief, and in refusing to dismiss their bill herein.

"*Sixth.*—The Court erred in admitting in evidence the following questions and answers propounded by complainants' counsel to Frank Anderson, to wit, the questions designated in the bill of exceptions touching the physical division of cotton or the apportionment of it between the several carriers at Memphis, and in admitting in evidence the announcement or resolution filed as Exhibit 10 to Anderson's deposition, showing such physical division or apportionment of cotton shipped out of Memphis, and in admitting in evidence the testimony of B. E. Sargent and J. M. Culp, and especially the supplement to Exhibit B. to the deposition of J. M. Culp, being the

Post *v.* Railroad.

announcement of the percentages to which each road would limit its carriage capacity.

"*Seventh.*—The Court erred in declining to compel the witness, H. B. Denming, to answer the question propounded to him touching the fact as to whether or not he or his firm had, prior to the 20th of December, 1898, received or accepted from the Star Union, or any other fast freight line out of Memphis, rebates or concessions from the regular cotton rate in force. The Court erred in refusing to compel the witness, C. C. Cowan, to answer the question propounded to him as to whether or not he or his firm received or accepted from the Star Union Line, or any other fast freight line out of Memphis, prior to the 20th of December, 1898, rebates or concessions from the regular established cotton rate in force.

"*Eighth.*—The Court should have held that, the subject-matter hereof being interstate commerce, under Art. 1, p. 3, of the United States Constitution, the State Court had no jurisdiction, and erred in overruling the second ground of demurrer.

"*Ninth.*—The Court erred in refusing to hold that under the provisions of the Act of Congress passed February 4, 1887, and amendments thereto, regulating interstate commerce, the defendant could not be compelled to issue bills of lading for goods to be transported beyond its own line over

connecting lines of carriers selected by the shipper.

"*Tenth.*—The Court erred in refusing to hold that the New Orleans announcement of December 20, 1898, was not violative of the provisions of the Act of Congress passed July 2, 1890, known as the anti-trust Act, or of the provisions of the Act of Congress to regulate interstate commerce, passed February 4, 1887.

"*Eleventh.*—The Court erred in refusing to hold that complainants herein could not maintain the bill for an alleged violation of the anti-trust Act, passed by Congress July 2, 1890, the United States being the only party authorized to maintain such a bill."

Before proceeding to consider the question of law involved, we think it necessary to pass upon several questions of fact as to which there is more or less of difference between the parties. It is insisted that the refusal to allow shippers to select their own routes applied only to the Memphis market, and to shipments of cotton; that it was first put in force after December 20, 1898; that repeated attempts were made after that time to make shipments over routes designated by shippers, and refused; that irreparable loss and damage resulted to shippers; that this action was taken in pursuance of the agreement made on December 20, 1898, at New Orleans, to that effect, and that such agreement was illegal, and

in violation of the laws of the State and the United States, and particularly the Act of Congress passed July 2, 1890, known as the "Sherman Anti-trust Law." It appears that prominent representatives of all the leading lines of railroad entering Memphis and of one packet line attended this meeting at New Orleans, which was formally held with a chairman and secretary. It is said, on one hand, that a binding contract was entered into between the several parties to do several things and pursue certain policies, while, on the other hand, it is said there was no binding contract that could be legally enforced entered into, but that the several individuals, for their companies, each outlined the course his company would pursue. The following minutes of the proceedings are put in evidence:

"The Southern Railway Company announces effective January 1, 1899:

"*First.*—That Frank Anderson is designated the individual agent of this line for the purpose of announcing its rates on export cotton traffic out of Memphis.

"*Second.*—That this line announces for itself that it will not cut unlawfully, or secretly reduce by any manipulation, of cotton from Memphis to foreign points adjusted for it from day to day by its appointed agent.

"*Third.*—That it will furnish daily to its ap-

pointed agent the lowest ocean rates from the various ports reached by it to foreign ports.

"*Fourth.*—That it will not cut unlawfully, or secretly reduce in any way whatever, its published tariff rates on cotton from Memphis destined to points within the United States and Canada.

"*Fifth.*—That, to preserve the integrity of its published tariff rates, it will control the routing of its cotton and issue its own bills of lading for all cotton forwarded over its road; that such bills of lading will not specify routing via any fast feight line nor routing via any connecting roads except to specify such terminal railroad deliveries as may be designated by shippers; that in the distribution of its cotton among its connecting lines it will have at all times due regard for the strict maintenance of its rates through to destinations; that it will give ten days notice in advance of any change in its policy.

"Representatives of the Illinois Central, Yazoo & Mississippi Valley, Nashville, Chattanooga & St. Louis; Kansas City, Memphis & Birmingham; Kansas City, Fort Scott & Memphis; Louisville & Nashville Railroad, and Memphis & Cincinnati Packet Co. made same announcement for their respective lines, and upon December 23 Mr. C. G. Warner, vice president of the Missouri Pacific Railroad made same announcement for his road, after which the following was adopted: That the

Post v. Railroad.

declaration with respect to maintaining of rates, the issuing by initial lines of their own bills of lading for cotton shipped from Memphis, become effective at once; provided, however, that the initial lines and fast freight lines will be allowed until the night of December 31 to get forward such cotton for which they have issued their bills of lading up to and including December 20, 1899. That initial lines and fast freight lines be required by Secretary Anderson to furnish him at once a statement showing the number of bales, marks, etc., of all cotton for which they have issued bills of lading up to and including December 20, 1898. Meeting adjourned. H. F. Smith, Chairman. Frank Anderson, Secretary."

"Supplement to the proceedings of a conference of the executive officers of the Memphis initial lines, held at New Orleans, December 20, 1898:

|  | Per cent. |
|---|---|
| Representative of the Southern Railway announced that his road would limit its carrying of cotton from and passing through Memphis from September 1, 1898, to August 31, 1899, to | 13.42 |
| Representatives of the Illinois Central and Yazoo & Mississippi Valley Railroads announced that their roads would limit their carrying to | 42.78 |
| Representative of the Louisville & Nashville Railroad announced that his road would limit its carrying to | 13.42 |
| Representative of the Nashville, Chattanooga & St. Louis Railroad announced that his road would limit its carrying to | 7.96 |
| Representative of the Memphis & Cincinnati Packet Company announced that his line would limit its carrying to | 6.50 |
|  | 100.00 |

"It was understood that Illinois shipments on through waybills for Yazoo & Mississippi Valley stations will not be included in the percentage announced by the Illinois Central and Yazoo & Mississippi Valley Railroads. H. F. Smith, Chairman. Frank Anderson, Secretary."

All evidence in regard to the physical division of cotton or the apportionment of it between the several carriers at Memphis was objected to, and introduced over the objection of defendant, and this action of the Court forms the basis of the sixth assignment of error. The grounds of objection are that the matter was irrelevant and incompetent, and that there was no issue tendered by the pleadings touching the physical apportionment of the cotton at Memphis. The parties have treated the real questions involved in this case to be, · first, whether the shipper or the carrier has the right to designate the route of through shipments at reduced through rates; second, whether the declaration of policy made at New Orleans was an illegal transaction, and whether the physical division of cotton shipments made in pursuance of that agreement was or was not illegal, and whether this Court has power to enjoin enforcement of such policies.

We are of opinion that the charge in the bill that the action of the railroad was due to the agreement at New Orleans, the terms of which are unknown to complainant, but whose tenor was

to restrain trade and commerce, and in violation of the laws of the State and the United States, was broad enough to let in full evidence as to what was done at that meeting, and what policies were outlined, and what division, if any, was made of the traffic at that place, and the terms of that division and the circumstances connected with it; but the extent of relief granted upon these matters must be governed, as in all other cases, by the pleadings and scope of the bill, and the jurisdiction of the Court, which will be hereafter considered. It is sufficient to say that we do not find from the record that the proceedings took the shape of an actual contract capable of legal enforcement by either party, but it was a simultaneous declaration of the same policy, which had already been practiced by each company, and this declaration by each was made in view and in consideration of the fact that rates had already been fixed by the keenest competition; that the declaration was made solely with reference to cotton in the Memphis market; and that concert of action upon this idea of maintaining the right to route cotton was first declared at the time and after this meeting and declaration. But we do not find that repeated efforts were made after that time to make shipments contrary to this line of policy, nor, as a matter of fact, that the complainants suffered any irreparable loss from a denial of their right

to name the shipping route for their cotton, nor, indeed, is any actual loss shown, and the case presented is simply a test case, and so intended, and the question resolves itself into the legality of the concerted action under the law, and the effect that such action, if illegal, may be presumed to have on the interest of the shippers.

Upon the abstract question as to whether the initial railroad company or the shipper has the right to designate .the route of through shipments at through rates · lower than local rates, while there is some conflict of authority, we think the weight of it, as well as the reasons, are in favor of the right of the railroad company to make the designation, and enforce it, when there are several lines equally prompt and reliable offered the shipper. It is virtually conceded that a railroad company cannot be required, as a legal obligation, to carry feights beyond its own terminal points, and this is in accord with the great weight, if not universal holding, of the cases. *Express cases,* 117 U. S., 1, 29 (6 Sup. Ct., 542, 628); *Coles* v. *Railroad Co.* (Ga.), 12 S. E., 749; *Myrick* v. *Railroad Co.,* 107 U. S., 102 (1 Sup. Ct., 425); *Hunter* v. *Railroad Co.* (Tex. Sup.), 13 S. W., 190; *Bird* v. *Railroad Co.,* 99 Tenn., 719; *Transportation Co.* v. *Bloch,* 86 Tenn., 415; Elliott on Railroads, p. 432; *Little Rock & Memphis Railroad Co.,* v. *St. Louis, Iron Mountain & Southern Rail-*

*way Co.,* 41 Fed. Rep., 563; *St. Louis Dray-age Co.* v. *Louisville & Nashville Railroad Co.,* 65 Fed. Rep., 41. This being both conceded and established, we think it must, upon authority and reason, follow that, if a railroad company does undertake to carry beyond its own terminus it may limit its liability to its own line (*Bird* v. *Railroad Co.,* 99 Tenn., 719, and cases cited), and it may determine what agencies it will select to make such further carriage. The Supreme Court of the United States, in the case of *Atchison, Topeka & Santa Fe Railroad Co.* v. *Denver & New Orleans Railroad Co.,* 110 U. S., 680 (4 Sup. Ct., 191), says: "At common law a carrier is not bound to carry except on its own line, and we think it quite clear that, if he contracts to go beyond, he may, in the absence of statutory regulations to the contrary, determine for himself what agencies he will employ. His contract is equivalent to the extension of his line for the purpose of the contract, and, if he holds himself out as a carrier beyond the line, so that he may be required to carry in that way, he may, nevertheless, confine himself to the particular route he chooses to use. He puts himself in no worse position by extending his route with the help of others than he would occupy if the means of transportation were all his own. He certainly may select his own agencies and his own asso-

ciates for doing his own business." This language is cited and applied by the United States Circuit Court of Appeals, Fifth Circuit, in the case of *Gulf C. & S. F. Ry. Co.* v. *Miama S. S. Co.,* 30 C. C. A., 151 (86 Fed. Rep., 416), the Court saying: "We listen attentively and with interest to the able oral argument of counsel who appear for appellee, and we have diligently examined the printed brief which they submitted, and the numerous authorities cited therein, but we do not find in all that they have advanced, or in any of the authorities we have examined, anything to weaken the force of the above suggestion, and the authority on which that suggestion rests."

In the case of *Little Rock & Memphis Railroad Co.* v. *St. Louis, Iron Mountain & Southern Railway Co.,* 41 Fed., 563, Caldwell, Judge, says: "At common law a carrier is not bound to carry except on his own line, and we think it quite clear that if he contracts to go beyond, he may, in the absence of statutory regulations, determine for himself what agency he will employ;" citing in support of the opinion *Atchison, Topeka & Santa Fe Railroad Co.* v. *Denver & New Orleans Railroad Co.,* 110 U. S., 667 (4 Sup. Ct., 185), and in the case of *St. Louis Drayage Co.* v. *Louisville & Nashville Railroad Co.,* 65 Fed., 41, the language of the Court in the 110 U. S. and 4 Sup. Ct. cases

Post v. Railroad.

is quoted and approved. In both these cases, as well as in the case of *Little Rock & Memphis Railroad Co. v. St. Louis, Iron Mountain & Southern Railway Co.,* 59 Fed., 400, the principle is clearly established that the matter of through tariff and through arrangements made by one railroad company with other carriers is wholly within the discretion of the first carrier, and that a Court of equity has no power to compel one carrier to make these arrangements with another, or to require one carrier to accept through freights or passengers tendered by another.

It is insisted that this principle is controlling of the case at bar, because, if the initial carrier has the right to make these arrangements and connections with other lines, he has the right at any moment to discontinue them, and the mandatory injunction issued in the case seeks to compel the defendant company to keep up these arrangements, whether they prove satisfactory or not. In the case of *Bird* v. *Railroad Co.,* 99 Tenn., 719, 722, the Court, speaking through Justice Caldwell, thus announces the proposition: "The first carrier had the legal right, at its election, to undertake the transportation of goods to the terminus of its own line merely, or to their ultimate destination. It was under no legal obligation, in the first instance, to transport them beyond its own line, and for that reason it was authorized by the law, when contracting

for such through transportation, to limit its liability by the clause mentioned." *Transportation Co.* v. *Bloch,* 86 Tenn., 415; *Railroad Co.* v. *Brumley,* 5 Lea, 401; *Dillard* v. *Railroad Co.,* 2 Lea, 288; *Telegraph Co.* v. *Munford,* 87 Tenn., 190; Lawson on Carriers, 236; Schouler on Bailment, 603; 2 Am. & Eng. Enc. Law, 866, 867; Rorer on Railroads, p. 1222; *Lotspeich* v. *R. R. Co.,* 73 Ala., 306.

Mr. Elliott, in his latest work on railroads, lays down the general doctrine as follows (Sec. 1432): "As a general rule, no carrier is bound by law to accept and carry goods beyond the terminus of its own line. In the absence of any agreement, either express or clearly implied, for transportation beyond its own line, the common law duty of an independent carrier is performed by safely transporting the goods over its own line, and delivering them to the consignees or connecting carrier as the case may be." It has been uniformly held that the Courts cannot compel a railroad company to enter into through traffic arrangements with other lines of railroad, it being a matter wholly within its discretion and for its sole determination. *Little Rock & M. R. Co.* v. *St. Louis, I. M. & S. Ry. Co.,* 41 Fed. Rep., 563; *St. Louis Drayage Co.* v. *Louisville & Nashville Railroad Co.,* 65 Fed Rep., 41. If this be true, and a carrier can refuse to make such through arrangement, certainly it

can refuse them after being made, if for suffi-cient reasons it does not desire to do so. The case of *Bird* v. *Railroad Co.,* 99 Tenn., 719, recognizes the right of the carrier to refuse to carry beyond its own line, or, if doing so, to limit its liability. If it can impose the con-dition of limited liability, it can certainly re-fuse to carry, if the privilege of selecting its connecting agencies is not given to it. In the 110 U. S. and 4 Supreme Court case, cited above, the rule is stated that, in the absence of statutory regulation, the carrier may select the agency it chooses to use. See also *Pullman's Palace Car Co.* v. *Missouri Pacific Railway Co.,* 115 U. S., 587 (6 Supreme Court, 194); *Chi-cago Railway Co.* v. *Pennsylvania Railway Co.,* 1 Interstate Commerce Com. R., 86; *Kentucky & I. Bridge Co.* v. *Louisville & Nashville Railroad Co.,* 37 Fed. Rep., 567; *Chicago & N. W. Ry. Co.* v. *Osborne,* 3 C. C. A., 347 (52 Fed. Rep., 915); *Little Rock & Memphis Railroad Co.* v. *St. Louis S. W. Ry. Co.,* 11 C. C. A., 417 (63 Fed. Rep., 775); *St. Louis Drayage Co.* v. *Louis-ville & Nashville Railroad Co.,* 65 Fed. Rep., 39; *Detroit, G. H. & M. Ry. Co.* v. *Interstate Commerce Commission,* 21 C. C. A., 103 (74 Fed. Rep., 838); *Mattingly* v. *Pennsylvania Co.,* 2 Interstate Commerce Com. R., 806.

The reasons why carriers should have this right to designate routes are forcibly stated by the

witness, Culp, who, it is shown, has an experience of twenty-eight years in the traffic departments of railroads. He says: "Satisfactory arrangements necessary to be made with all parts of the line for operation · of through rates include proportions to be allowed each carrier; the ability of the connecting lines to transport the traffic with the utmost speed; the solvency of different parts of the line; their willingness to and ability to promptly settle claims, either for loss to property, overcharge in rates, or loss of cars or other property of the company; reciprocity on the part of the connecting lines in delivering freights to the defendant for transportation over its line in return for freights delivered to such connecting · lines by it; participation in salaries and expenses of agencies established for procurement of traffic; compliance with the law, State and national, with respect to rates applying to traffic over such other lines; friendly co-operation of connecting lines, and performance of the duty so as to satisfy patrons and increase business; that it may not be compelled to send its cars over connecting lines which will not promptly return them, in order to select such connections as are able · to furnish it a proportion of cars needed by the through lines; that it may not be required to haul cars to Memphis empty, to meet requirements of shippers, in order to load their freight, while it may have a supply of empty cars on

hand to be returned by other routes; so to distribute its tonnage as not to congest one or more of the roads, while forwarding so little traffic over other lines as to cause them to form other connections, to the disadvantage of the Southern Railway." He continues: "To promptly handle freight, defendant should, from time to time, select some particular carrier as against others. It is necessary at times to send a larger percentage of business than usual via a particular line, in order to return loaded cars which would otherwise return empty, or to furnish loads for steamships which would otherwise be compelled to sail from port without loads." Illustrating this, he cites cases of steamships plying from the ports of Brunswick, Piners' Point, and other South Atlantic seaports, to New York, Philadelphia, and other North Atlantic seaports, running in connection with the Southern Railway Company. It may be necessary, in order to load a ship sailing from Brunswick at one particular time, to route all, or practically all, of its freight to that port, when the next day the situation may be reversed, and it may have to send all of its freight to Norfolk; the making of arrangements to increase the efficiency of the carriers; the necessity of looking to the solvency of lines over which their business is to be transported and their cars sent; and the willingness and ability of such connecting lines to pay claims for loss

19 P—14

of property, and for car mileage. See, on this subject, Ray on Neg. Imp. Duties (Freight Carriers), pp. 668, 669.

The case of *Coe* v. *Railroad Co.,* 3 Fed. Rep., 775, is cited by complainants' counsel as holding a doctrine contrary to this, but we think that case is not in point. It was a case where a stock yard had been constructed and used for a number of years as a mutual convenience between the owner and the railroad. The latter then entered into a contract with a rival stock yard company, and agreed to give it a monopoly of the stock business, and required the former stock yard owner to ship through the latter. The railroad had no yards of its own, and it was held that the railroad could not, in this manner, require the complainant to transact his business through a competitor at an increased expense. And a number of authorities are in accord with this holding. Elliott on Railroads, 1551; *Stock Yards Company* v. *Keith,* 139 U. S., 128 (11 Supreme Court, 461). But we do not consider this case as applicable to the present one.

The case of *Express Company* v. *Koontze,* 8 Wall., 342, is also relied on for complainants. That was a shipment of gold dust, and at the time of the shipment one of the two connecting lines was in territory in which a state of war existed, and was dangerous, and the express company had notice of this fact, and was cautioned

not to ship over that line. It did so, however, and the freight was seized by a body of armed men. There was a recovery from the express company upon the ground that it was negligent in shipping over a dangerous ground, when it should have shipped over a safe one; but the question of the absolute right in the shipper, no sufficient circumstances or reasons appearing to the contrary, to direct how his freight should be carried, was not considered and was not necessarily involved.

The case of *Railroad Co.* v. *Odil,* 96 Tenn., 61, 64, is also referred to and relied on by complainants, but that is a case where the railroad company and the shipper had agreed upon a route, and the carrier had deviated from it without the consent of the shipper, and without notice to him, when notice could have been given, and the railroad was held liable for the deviation.

The case of *Rea* v. *Railroad Co.,* reported in 7 Interstate Commerce Com. R., pp. 43–54, is in point, and in favor of complainants' contention. In that case the complainant offered the Mobile & Ohio Railroad Co. a car load of potatoes at Verona, Miss., and asked that they be forwarded to Cleveland, Ohio, over what is denominated the Big Four route, with which the initial railroad company had at the time through billing arrangements and through rates, and which, it appears, was a more expeditious route, but the agent of

the railroad company refused to receive and route the shipment in accordance with such directions, and complainant was thereby damaged to the extent of one hundred dollars. The Commission held that the complainant was entitled to have this merchandise carried over the route which he directed, and that the failure to receive and forward the shipment was a discrimination against complainant in violation of the Act to regulate commerce, and reparation was ordered. The railroad company attempted to show that this refusal was due to the fact that at the time the strike was in effect on the Big Four route, and it could not handle the potatoes; but upon this point the proof was not sufficient to sustain the contention of the railroad. The commissioner cites in his report of his ruling two cases; one, *MacLoon* v. *Railroad Co.,* 5 Interstate Commerce Com. R., 84 (3 Interstate Commerce Com. R., 711), and the other, *Pankey* v. *Railroad Co.,* 3 Interstate Commerce Com. R., 658 (3 Interstate Commerce Com. R., 33). In the first of these cases the complainant was a shipper of coal, and the railroad refused to switch complainant's cars to his shed unless he would pay demurrage after a certain number of hours, a condition not exacted of other shippers similarly situated; and the only point really decided was that all shippers must be treated alike by the carrier, and no discrimination could be made between them.

It is not contended there was any discrimination against complainants in the case at bar as between themselves and other Memphis shippers. In the latter case of *Pankey* v. *Railroad Co.* complainant shipped some boxes of books from Troupe, Texas, to Fort Lawn, South Carolina, and directed the shipment to be made "via Vicksburg," and the goods were so billed. It so appeared that this was the cheaper of the two routes, but, after giving the bill of lading for them, consenting to the shipment by the cheaper route, the books were, by the railroads, sent the other and more expensive route. As reported, this case was merely one of deviation from an agreed route, and stands upon the same basis as the case of *Railroad Co.* v. *Odil,* 96 Tenn., 64. The report is apparently confused, inasmuch as it states in one part that the goods were billed by the way of Vicksburg, and in another that there was no **shipping directions** on the waybill to indicate the route. We gather from these statements that the goods were billed to the shipper "via Vicksburg," but this direction was omitted from the waybill to the connecting carriers, and it was upon this ground the initial carrier was held liable for the difference between the charges of the two routes. We think these cases do not support the ruling of the Commissioner, and that the report cannot be considered as controlling.

The main question as to the right of the

shipper to route the goods is assumed rather than considered and decided upon reason or authority. As a result of the authorities, we are of opinion that when the shipper, by the assent of the carrier, designates the route, that route must be pursued, and a deviation therefrom is at the risk of the carrier. *Railroad Co.* v. *Odil,* 96 Tenn., 64; *Railroad Co.* v. *Cole,* 68 Georgia, 623; *Railroad Co.* v. *Day,* 20 Ill., 375; *Congar* v. *Railroad,* 17 Miss., 477; *Railroad Co.* v. *Thomas,* 89 Ala., 294 (7 South., 762); *Johnson* v. *Railroad Co.,* 33 N. Y., 610; Hutch. on Carriers, pp. 14, 112, 314; Redf. on Carriers, p. 34. When no special instructions are given and assented to as to routes, the initial carrier may select the route or use that commonly employed by it to the point of destination named. The absence of special instructions given and acceded to amounts to an assent that the carrier's usual course of business may be followed, and it may designate the route as its convenience may suggest. *Snow* v. *Railroad Co.,* 109 Ind., 425 (9 N. E., 702); *Frank* v. *Railroad Co.,* 52 Miss., 570; *Railway Co.* v. *Duncan,* 40 Kansas, 503 (20 Pac., 195); *Hostetter* v. *Railroad Co.* (Pa. Sup.), 11 Atl., 609; *LeSage* v. *Railway Co.,* 1 Daly, 306; Ray on Neg. Imp. Duties (Freight Carriers), pp. 97, 318, 393, 668, 669. But when goods are tendered for shipment to a point beyond the carrier's line, and there are two or

more routes equally safe, prompt, and reliable, the carrier cannot be compelled to accept the goods to be carried over one route in preference to another, at the option of the shipper, unless some reason appears therefor; and especially is this so when the carrier shows that in the conduct of its business the use of one route may be advantageous to it without injury or sacrifice to the interests of the shipper. In order that the shipper may have the right to dictate the route under such circumstances, he must show some legitimate advantage or some detriment to himself in the selection of one route over another, and, in the absence of such showing, he is not entitled to dictate the route against the wishes of the carrier, and especially is this the case when the carrier shows that such designation will operate to its prejudice and injury.

In the case at bar it is not insisted that there is any discrimination as between shippers at Memphis. It is not insisted that there is any difference in charges as between the several lines. It is not insisted that the rates are unreasonably high, or in any way oppressive, but, on the contrary, it appears that, owing to fierce competition of different roads and the river, the rates are lower than elsewhere; and it is not shown that the complainants would receive any special benefit by shipping over the lines selected by them, or would suffer any loss by shipping

over any other line. It was attempted to be shown that the shippers, by using the lines selected by them, would indirectly receive benefits in the way of rebates from the Star Union, a fast feight line owning no road of its own, and not entering Memphis at all, and some evidence is given tending to show such is the fact. If such fact be true, it would result that complainants would not be entitled to the extraordinary relief prayed by them, that they might gain an illegal advantage over other shippers. And while complainants had the right to refuse disclosure of this feature of the case, because it might tend to incriminate them in an unlawful act, still it leaves them, in view of the proof offered, in a situation that they do not come into the Court with a clear right and with clean hands to ask a relief which is extraordinary, and should be granted only in the clearest case. The rule is that a mandatory injunction, such as is asked for in this case, will not be granted except in extreme cases, and when Courts of Law are unable to afford adequate redress, or when the injury complained of cannot be compensated in damages. Gib. Suits in Chancery, pp. 784–806; 1 High on Inj., p. 3; 3 Pom. Eq. Jur., p. 1359; *Hall v. Railroad Co.,* 12 Am. & Eng. R. R. Cas., 41. As bearing upon the question of good faith in bringing this suit to redress real injuries actually inflicted or imminent, some facts developed in the record are

very significant. It appears that prior to December 20, 1898, there was no shipment of domestic cotton via Alexandria, and that from December 20, 1898, to February 18, 1899, there were shipped over the Southern Railway six thousand eight hundred bales of unrouted cotton, of which five thousand nine hundred and sixty-three bales were sent by it via Alexandria, and eight hundred and forty-six bales by the way of Cincinnati, the sending of the cotton over these routes being at the will and by the selection of the carrier; and that from February 18, the date of the injunction, to March 1, 1899, the defendant company carried four thousand one hundred and forty-two bales of cotton, of which one thousand eight hundred and ninety-seven bales were unrouted, and were sent one thousand two hundred and seventy-nine bales via Alexandria, two hundred bales via Bristol, four hundred bales via Norfolk; and the shippers giving this unrouted cotton—parties to the bill herein—were Porter, Deming & Co., one thousand three hundred and seventy-nine bales; in other words, from December 20, 1898, to March 1, 1899, there were delivered to defendant company eight thousand six hundred and eighty-eight bales of cotton upon which no routing directions were given, and since February 18 there were given two thousand two hundred and sixty-three bales routed since the injunction, and that of the unrouted cotton, Porter,

Deming & Co. shipped one thousand three hundred and seventy-nine bales, F. M. Crump & Co. three hundred and forty-two bales, W. M. Bolles & Son five hundred bales, and other complainants twenty-four bales. So that although the bill alleges that the right to send the cotton over this particular line was indispensable to the complainants, and they were being irreparably damaged by the refusal of the defendant to route the cotton, we have only three firms out of the eleven complainants shipping any cotton over that line, and of these three firms one (Porter, Deming & Co.) giving to the defendant one thousand three hundred and seventy-nine bales of cotton upon which no routing is desired by them. In view of the proof to the effect that none of the complainants, prior to the filing of the bill in this case, had shipped cotton over the route now contended for, and that eight of the firms, while the injunction was in force, and they had the right to do so, shipped no cotton by this route, and that of the four thousand one hundred and fifty-two bales shipped by the other three firms since the injunction has been in force, one thousand three hundred and seventy-nine bales were not routed by the shipper, it does not appear from the proof that this particular route was a necessity, or that complainants have been irreparably injured in not shipping over it.

We think it clearly developed by this record

that neither the complainants nor other Memphis shippers desire to ship cotton to eastern points by the Alexandria route, and this is virtually conceded, but this route was selected in making up the test case, because by it the defendant selected to be used had the longest haul, and could therefore make complaint with the least good grace. But the principle is the same if defendant had only ten miles of the through route instead of several hundred, and under complainants' contention the defendant could be compelled to carry over its shortest connecting line as well as over its longest. It also clearly appears, so far as this record shows, that the matter of routing cotton is one of indifference to shippers at Memphis, except so far as it is required by the demands of eastern consignees; and it further appeared that these demands are made in the interest of the Star Union, a fast freight line operating in eastern territory, having no road of its own, and not entering the city of Memphis over the line of any other road, but proposing to so bill and route cotton at Memphis as to secure its carriage over its own line when it reaches its eastern field of operation. Whether shippers or consignees receive, directly or indirectly, any rebates or concessions as a result of shipments over this fast freight line, is the question which complainants refuse to answer, because it might tend to incriminate them; but there is

other evidence that by some secret arrangement such rebates are secured. The effort, then, resolved itself into one by which eastern consignees seek to create a monopoly in the carriage of cotton by the Star Union line wherever it enters or passes through its territory, and this because of some undisclosed secret arrangement by which either consignees or shippers obtained rebates and concessions not enjoyed by other freight or railroad lines. The Courts cannot be used to carry such an arrangement into effect. It is true other reasons are assigned why this fast freight line is preferred, but they are to a considerable extent specious, and the fact remains that the rebate or concession is an important, if not controlling, feature. The effect upon insurance in transit is mentioned as a matter of great importance, but it appears that the defendant did not designate the route in the bill of lading so that the insurance could not be effected on the line designated. It is said, also, that the initial carrier may, and probably would, select an insolvent connection; but, if this was done, it would be ground of liability under all the cases upon the initial carrier, for the carrier's right does not extend to the selection of insolvent lines or uncertain and unreliable agencies. We are of the opinion that upon the main questions as to the right of carrier and shipper to designate the route of through shipments at through rates, all

other questions being out of the way, the law is and should be that, in the absence of any sufficient or controlling reason to the contrary, the carrier should have that right. We are also of opinion that the facts in the case, leaving out of view the New Orleans arrangement, do not show such a right in the complainants as entitles them to a mandatory injunction.

It only remains to consider the effect of the agreement or action of the carriers at New Orleans in regard to cotton shipments at Memphis. We think it appears from the record that prior to that meeting the question of the abstract right to routes had not arisen between shippers and the carriers at Memphis or elsewhere, but that routing had been a matter of consent or assent, express or implied, between the two. While there was a declaration of policy at New Orleans that applied only to Memphis cotton shipments, it did not concede the question or assent to the claim of the shipper to route as to other points or different freights, but left these untouched; and the naming of Memphis was not a discrimination prejudicial to it, but was simply because the question had arisen there, and had not arisen elsewhere, and had not become a matter of importance elsewhere. Now, if it had been made to appear that in consequence, and as a result of this declaration or agreement, rates had advanced, or any injury had resulted, or any shipper had

been prejudiced, or that such was the purpose of the declaration, or its direct or inevitable result, it would have been clearly illegal, and an attempt to execute and enforce it could, by a proper proceeding, have been prevented; but if the declaration was simply an expression of a right which the carriers had without such declaration, and not made for an illegal purpose, and did not operate prejudicially to shippers, such declaration would not be unlawful, nor would it furnish ground for injunction. It does not appear that, in consequence of this declaration, rates were advanced, but, on the contrary, it appears that they were reduced, and that, too, in the territory where the demand originated. It is said, however, on the next day after the New Orleans agreement, rates on export cotton were advanced nineteen cents per hundred, but we do not think the record sustains the contention that this was in consequence of the New Orleans agreement, but such export rates are shown to be liable to sudden and violent fluctuation from a number of causes. Nor does it appear that the advance was caused by the failure to reach the New York and Boston market, for the defendant offered to put cotton in these markets over such terminal lines as the shipper might desire. We think the maintenance of uniform, reasonable rates a matter of the highest importance to both shippers and carriers, and, on the other hand, the prevention

of cut rates and discrimination is equally important to both. The carrier is worthy of his hire—that is, to receive reasonable compensation for his service and risk—while the shipper is entitled, in the first place, to reasonable rates for the service rendered him, and, in the next place, to have the same rates, no more, no less, than other shippers.

So the shipper is not entitled to receive, nor the carrier to give, directly or indirectly, rebates and concessions to some which are not given to others, and all of this is virtually conceded.

We are of opinion the action taken at New Orleans, if in violation of the provisions of the Act of July 2, 1890, known as the "Sherman Anti-Trust Law," cannot be reviewed in this action. That Act has been construed by the Supreme Court of the United States in the case of *United States* v. *Joint Traffic Associations,* 171 U. S., 505 (19 Supreme Court, 25), and in the case of *United States* v. *Trans-Missouri Freight Association,* 166 U. S., 290 (17 Supreme Court, 540). The opinion in each case was that of a bare majority of the Court. While it is not our purpose in the slightest degree to question or criticize the holding of the majority, we feel justified in saying that it gives a force, effect, and scope to the provisions of the Act which cannot be reached by applying the general principles of the law, but must be sustained alone

by the provisions of the Act, and an enforce-
ment of them to the letter, and, in some cases,
contrary to the purpose and spirit of the Act.
As we understand these cases, the difference be-
tween the majority of the Court and the minor-
ity is that the majority hold the Act to prohibit
all contracts and combinations which shut out the
operation of the freest and most unlimited com-
petition, and the fact that competition of any
kind, and to any extent, is restrained is con-
clusive of the question that the contract is in
restraint of trade; while the opinion of the minor-
ity holds that a contract or agreement is not in
violation of the Act unless its direct and im-
mediate effect is to restrain trade and commerce,
and the mere fact that competition is not un-
limited, is not conclusive upon this point, and it
is not sufficient to render an arrangement obnox-
ious to the Act, that its effect might be in re-
straint of trade or commerce, but such must be
its direct and immediate effect. It is said in
the opinion of the majority that, even though the
rates are reasonable, the agreement cannot be sus-
tained, because they may (under the agreement)
easily, and at any time, be increased. But it
appears that under the declaration of policy in
this case rates are not to be advanced, but are
to be maintained at the reasonable rates where
competition had placed them before the agreement
was made. The Court said: "It is the combina-

tion of these large and powerful corporations, covering vast sections of territory, and influencing trade throughout the whole extent, and acting as one body in all the matters over which the combination extends, that constitutes the alleged evil, and in regard to which, so far as the combination operates and restrains interstate commerce, Congress has power to legislate and to prohibit. The prohibition of such contract may, in judgment of Congress, be one of the reasonable necessities for the proper regulation of commerce, and Congress is the judge of such necessity and propriety." And again: "The power to regulate commerce has no limitations other than those described in the Constitution. . . And the constitutional right of the citizen to make contracts relating to his lawful business is not inconsistent with the exercise of the power of Congress to prohibit contracts of the nature involved in this case."

In response to the earnest contention of counsel that competition may itself be carried to the extent of being a restrait upon trade and commerce in unsettling rates, provoking wars, and impoverishing and destroying the carriers themselves, the Court admits that such a result is possible, but remote, and closes the opinion by saying: "An agreement of the nature of this one, which directly and effectually stifles competition, must be regarded, under the statute, as one in

19 P—15

restraint of trade, notwithstanding there are possibilities that a restraint of trade may also follow competition that may be indulged in until the weaker roads are completely destroyed, and the survivors thereafter raise rates and maintain them." It is added: "It is not only possible, but probable, that good sense and integrity of purpose would prevail among the managers (of the railroads), and, while making no agreement and entering into no combination by which the whole railroad interest as herein presented should act as one combined and consolidated body, the managers of each road might yet make such reasonable charges for the business done by it as the facts might justify."

We are of opinion that the declaration of the several roads in this case does not make them a combination or consolidated body, bound together by a contract or a legal agreement, but they can only be considered as a declaration by each road of its individual policy, and there is no stipulation to make a change in rates, but to observe those already made under competition, and for the purpose of preventing a practice which could not be for the general interest of shippers, but was only to subserve the secret purposes of a line extending cut rates to its customers, the effect of which would be to restrict commerce instead of to further and enlarge it. We think the provisions of this Act, and the statutes of

the States, can be enforced only in the manner and by the Courts provided in the Acts, and not by the State Courts in the exercise of their equitable jurisdiction.

In order to obtain relief in Courts of Equity, it must appear, not simply that there is a concert of action, but that its direct and immediate effect is to restrain commerce and trade, and not merely that it may be hereafter used for that purpose by a departure from its present purposes and practices, and there need be some special ground for equitable interference. That this declaration of policy by the several roads may hereafter be made the basis for illegal acts and practices, is not sufficient ground for a present injunction unless such illegal act is its direct and necessary effect; and it must be borne in mind that the bill in this case is not framed to set aside the New Orleans agreement as illegal, but that it is used as matter merely collateral to the main question, which is the right of the shipper to route his cotton, a right which, on the one hand, is claimed, and, on the other, denied, without regard to the New Orleans arrangement, and as though it had never been made. The object of anti-pooling and anti-trust laws is to prevent unlawful restrictions and restraints upon commerce and trade, and provide for each and all equal facilities, free competition, and reasonable rates; but they were never intended to be used by one

agency or individual to create or sustain a monopoly in its own favor, under the guise of defeating an arrangement which certainly defeats it in its unlawful purpose, but which, it is alleged, may be used hereafter for harmful and injurious purposes and objects. The Act of July 2, 1890, distinctly provides that an agreement of this kind cannot be enjoined except by the suit of the United States, through its District Attorney, upon the authority of the Attorney-general; and such has been the holding of the Courts in construing it. The remedy given to third persons by the Act, after its violation, is to recover threefold damages with costs and attorneys' fees.

In the case of *Gulf, S. & S. F. Ry. v. Miami S. S. Co.,* reported in 30 C. C. A., 142 (86 Fed. Rep., 407), being an opinion rendered by the Circuit Court of Appeals for the Fifth Circuit, in construing the Act of July 2, 1890, the Court says: "The appellee contends that the defendant railway companies entered into such a combination, conspiracy, and agreement as is prohibited by the Act to protect trade and commerce against unlawful monopoly, approved July 2, 1890, for the purpose and with intention of monopolizing the traffic and interstate commerce between New York and Galveston in restrait of such commerce, and for the purpose of preventing complainant from carrying on its business of common carrier for such traffic. Counsel cites Secs. 1, 2,

Post *v.* Railroad.

3, 4, and 7 of the Act named. Secs. 1 and 2 are strictly penal. So far as Sec. 4 confers any new jurisdiction upon the Circuit Court of the United States to prevent and restrain violations of this Act, such new jurisdiction, if any is conferred, appears to be limited in its exercise to suits on behalf of the government, instituted by the District Attorneys of the United States in their respective districts, and under the direction of the Attorney-general." Further discussing the question, the Court says: "But it (the Act in question) gives no new right to bring a suit in equity, and a careful study of the Act leads to the conclusion that suits in equity or injunction suits, by any other than the government of the United States, are not authorized by it." In the later case of *Southern Indiana Express Co.* v. *United States Express Co.,* 88 Fed. Rep., 663, Baker, J., thus announces the rule: "The anti-trust law of July 2, 1890, has wrought no such change in law as will enable the Court to enforce its provisions in favor of a private party by bill in equity. Under this Act the only remedy given to any other party than the government of the United States is an action at law for threefold damages, with costs and attorneys' fees; and the only party entitled to maintain a bill in equity for injunctive relief for an alleged violation of its provisions is the United States, by the District Attorney, on the authorization of the Attorney-general." And so

the law of the State relating to the formation of trusts is placed among and ranked as one of the criminal laws of the State, under the head of offenses against public and private property, and its violation is made a misdemeanor, and a penalty is prescribed of a fine of not less than $250 and a tax fee of $50 to the 'Attorney-general, besides 50 per cent. of all money actually received on such crimes; and the Courts are required to give the Act in charge, and the grand jury is given full inquisitorial power in such cases, and such contracts cannot be enforced in the State, whether made by citizens of this or any other State. The Acts still further provide for a forfeiture of the franchise of any corporation guilty of violating the law by suit in the name of the State. This is the remedy which the statutes provide for its violation; and, if an injunction is sought instead of this remedy, it will be sustained only upon such grounds as would warrant injunction in other cases.

It is insisted that under the agreement between the connecting lines set out in this case, they must be considered and treated as partners in the handling of freights, but we are of opinion such is not the case, but each line is independent of the other, and they simply have a mere traffic agreement between themselves as to the terms upon which each will carry freights for the other; and the rule governing partnerships

Post v. Railroad.

and the liabilities and duties attaching to that relation do not exist under the facts in this record. The authorities are hard to reconcile, if, indeed, they do not positively conflict, upon this question of partnership or no partnership arising out of such agreements, but we think it may safely be said that a mere traffic agreement, as in this case, providing for a proportionate division of freight charges, does not constitute a partnership. 6 Am. & Eng. Enc. L., p. 667, and notes, and numerous cases cited. Upon a consideration of the whole case, we are of opinion the complainants are not entitled, under the facts in this record, to designate the route of their shipments over the objection of the carrier, and they are not entitled to the injunction prayed as to the twenty-four bales, or as to other and future shipments; that complainants are not entitled to enforce the provision of the Act of Congress or the State of Tennessee referred to by the process and means and under the proceedings in this case, and that the declaration of the carriers at New Orleans, and the proceedings then taken do not furnish any ground for the relief prayed in this case; and, hence, there is error in the decree of the Court below and it is reversed, and the injunction is dissolved, and bill is dismissed, at cost of complainants.